JAMES M. PIERCE CORPORATION,
Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 17265.

United States Court of Appeals
Eighth Circuit.

Jan. 8, 1964.

Rehearing Denied Feb. 28, 1964.

Kent Emery, Des Moines, Iowa, made argument for petitioner and filed brief with James F. Swift, Des Moines, Iowa.

Harry Marselli, Atty., Dept. of Justice, Washington, D. C., made argument for respondent and filed brief with Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum and Earl J. Silbert, Attys., Dept. of Justice, Washington, D. C.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and YOUNG, District Judge.

BLACKMUN, Circuit Judge.

The Tax Court has upheld the Commissioner's determination of a deficiency in the federal income tax of James M. Pierce Corporation for its fiscal year ended June 30, 1957. Judge Mulroney's decision, not reviewed by the full court, is reported at 38 T.C. 643. The taxpayer has petitioned for review.

The initial issue before us concerns the includability in gross income of the amount of prepaid magazine subscriptions unexpired in the taxable year during which the publication was sold and the subscription liability was assumed by the purchaser.

The Commissioner originally determined deficiencies in tax for each of the taxpayer's fiscal years 1954 to 1957, inclusive. These were attributable, almost in their entirety, to claimed surtax for improper accumulation of surplus, under § 102(a) of the Internal Revenue Code of 1939 for fiscal 1954, and to claimed accumulated earnings tax, under § 531 of the 1954 Code for the other taxable years. Only in an amendment to his answer did the Commissioner propose a further and additional deficiency for fiscal 1957 attributable to the unexpired subscriptions.

■ The Tax Court decided the accumulation issue in favor of the taxpayer. No cross petition for review has been filed by the Commissioner. Consequently the accumulation issue and taxes for fiscal 1954 to 1956, inclusive, are not before us. Helvering v. Pfeiffer, 302 U.S. 247, 250–251, 58 S.Ct. 159, 82 L.Ed. 231 (1937). The court, however, decided the subscription issue in favor of the Commissioner and held that there was a deficiency in the taxpayer's fiscal 1957 income tax in the amount of $222,788.96. It is this result which is under attack here.

The taxpayer is an Iowa corporation organized in 1902 for the purpose of taking over an existing publishing business established by its founder. It published in Des Moines a farm newspaper called The Iowa Homestead. It sold subscriptions to this paper for fixed terms beyond one year with advance payment made by the subscriber.

In September 1929 the taxpayer sold, under contract, its real estate, machinery and equipment and all assets relating to its job printing business and to the newspaper to the Wallace Publishing Company, publisher of another farm newspaper called Wallaces' Farmer. This purchaser combined the two papers into one and published it under the name of Wallaces' Farmer and Iowa Homestead.

Wallace, both before and after the purchase, had a business practice of selling a perpetual subscription. The subscription could be redeemed by the subscriber, his heirs, or assigns, at any time after one year for nine-tenths of the purchase price. Upon the sale of a perpetual subscription Wallace allocated on its books one-tenth of the price to earned income for the then current taxable year and nine-tenths to a perpetual subscriptions reserve account. If the subscription was redeemed, that reserve, of course, was debited accordingly.

In 1931 Wallace became delinquent under its purchase contract with the taxpayer. Foreclosure proceedings were instituted. A receiver was appointed. Finally, in December 1935, the taxpayer, at a sheriff's sale, purchased all Wallace's property used in the operation of its business. The taxpayer bid in the property for $1,013,000 and assumed Wallace's liabilities including those for unexpired subscriptions. It then continued the publication of the combined newspaper. The taxpayer, however, sold no perpetual subscriptions.

The taxpayer filed its income tax returns on the accrual method of accounting. Since 1919 it had reported as income only an aliquot part of its prepaid subscriptions in each year and carried the balance in an unearned subscription reserve account. This was a method employed by many publishers. It found official sanction in I.T. 3369, 1940–1 C.B. 46, for accrual basis publishers, such as the taxpayer, who had consistently followed the practice over a period of years.

This reporting method, however, was denied to new publishers and others.

In June 1957 the taxpayer's shareholders, in contemplation of the provisions of § 337 of the 1954 Code, adopted a plan of complete liquidation. This plan complied with Iowa law. Under Iowa Code, § 491.56, I.C.A. the taxpayer continues appropriately to act for the purpose of winding up its affairs. On June 27 the shareholders approved an offer of The Prairie Farmer Publishing Company, an Illinois corporation, to purchase the business. By the sale agreement, effective June 28, Prairie paid the taxpayer $1,406,789 in cash and also assumed " \* \* \* the obligation of Pierce to publish 'Wallaces' Farmer and Iowa Homestead' and to carry out in accordance with their terms all subscription contracts in force as of the date of closing for the unexpired period of the subscriptions". On June 28, the balance in the taxpayer's reserve for unearned subscriptions was $396,019.31, and that in its reserve for perpetual subscriptions, taken over entirely from Wallace, was $40,340.25. These totaled $436,359.56. This figure was taken into account as an adjustment in the amount of the cash paid by Prairie.

The taxpayer did not report any part of its unearned and perpetual subscription reserves, theretofore untaxed, as income for fiscal 1957. These are the amounts which the Commissioner determined were includable.

The issue therefore is the proper income tax handling of these reserves. The Tax Court held, pp. 655–657 of 38 T.C., that they were includable in their entirety in fiscal 1957. It reasoned that when Prairie assumed these liabilities the taxpayer realized income accordingly; that the need for holding the unearned subscriptions in a reserve account then no longer existed; that the taxpayer was released from its liability to its subscribers; that this was the appropriate time to restore the prepayments to income; and that if this were not done the amounts would escape tax altogether. It drew an analogy to the bad debt reserve cases and it found support in the 1958-enacted § 455 of the 1954 Code. It summarily dismissed, p. 658, as having no merit, taxpayer's secondary argument that it had paid Prairie to assume the liabilities under the subscription contracts and hence was entitled to a deduction for that payment.

■■ We agree with the Tax Court's holding that, technically, the reserves were includable in gross income and taxable for fiscal 1957. We disagree, however, with its dismissal of the taxpayer's secondary argument. We hold, instead, that, under the facts of this case, the inclusion is in effect nullified by an offsetting deduction equal to the amount by which the gross sale price to Prairie was reduced by Prairie's assumption of the subscription liabilities, and that this is so whether there is a "payment" by the passing of dollars back and forth or whether only the net cash amount is transferred.

1. The income aspect. Perhaps it is now settled that, for taxable years ending prior to 1958, a taxpayer-publisher's receipt of cash subscriptions prepaid for more than one year normally would constitute taxable income for the year of receipt despite the taxpayer's being on the accrual system. Schlude v. Commissioner, 372 U.S. 128, 132–135, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963); American Auto. Ass'n v. United States, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961); Popular Library, Inc., 39 T.C. 1092, 1098 (1963). See Automobile Club v. Commissioner, 353 U.S. 180, 188–190, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). Cf. Beacon Publishing Co. v. Commissioner, 218 F.2d 697 (10 Cir.1955), and the Supreme Court's refusal, footnote 20, p. 189 of 353 U.S., pp. 712, 713 of 77 S.Ct., 1 L.Ed.2d 746, to pass upon the correctness of that decision.

But, and in any event, this result did not ensue for Pierce because of the sanction by I.T. 3369, supra, of the taxpayer's long continued contrary practice.

It would therefore seem logically to follow that, when the reasons for the establishment of the reserves and their

tax deferral cease to exist, the taxability which had been deferred should forthwith mature. We so hold and do so with the following observations:

(a) Both reserves were set up by the taxpayer as a matter of realistic accounting recognition of the taxpayer's obligations and liabilities. It made sense taxwise, too, to defer the inclusion of prepaid subscriptions in income until the obligations with attendant expenses were being fulfilled. As has been noted, the tax authorities went along with this. It makes equal sense, however, that, when the taxpayer's obligations and liabilities terminate, the continuance of the reserves and of the tax deferral should also cease. This took place in fiscal 1957, the year of the sale to Prairie and its assumption of the subscription obligations. All this is practical accounting and practical tax treatment. It is not a matter of the receipt of income through Prairie's assumption of liabilities; it is a matter of income inclusion by the rightful cessation of income deferral.

■ (b) We find precedent in the bad debt cases. Where additions to a reserve for bad debts have been effected, with deductions from gross income, and then the need for the reserve ceases, the amount of the reserve at that time is includable in gross income. West Seattle National Bank of Seattle, 33 T.C. 341, 343–44 (1959), aff'd 288 F.2d 47 (9 Cir.1961); Arcadia Sav. & Loan Ass'n v. Commissioner, 300 F.2d 247 (9 Cir.1962); Citizens Fed. Sav. & Loan Ass'n of Cleveland v. United States, 290 F.2d 932 (Ct.Cls. 1961); Ira Handelman, 36 T.C. 560, 565 (1961); Geyer, Cornell & Newell, Inc., 6 T.C. 96, 100 (1946). Although a bad debt reserve is neither an asset nor a liability and although it concerns deductions with past tax benefit, as contrasted with the obligation character and deferral-of-income aspect of subscription reserves, we feel that the tax consequences are indistinguishable and that the result must be the same for both.

(c) We find precedent, too, in Boston Consol. Gas Co. v. Commissioner, 128 F. 2d 473 (1 Cir.1942). This case concerned a reserve for refundable cash deposits required in advance from utility customers and another reserve for unconsumed portions of 25¢ meter collections made in advance of gas deliveries. When the taxpayer's general ledger was adjusted downward to conform with a new and detailed customers' ledger, the resulting credits to surplus were held to be taxable income in the year of adjustment. This conclusion was tied to the elimination, to that extent, of the necessity for the reserves. The situation closely parallels and corresponds, we feel, to the one before us. Other cases of similar tenor which are helpful and indicative are Wichita Coca Cola Bottling Co. v. United States, 152 F.2d 6, 8 (5 Cir.1945), cert. denied 327 U.S. 806, 66 S.Ct. 964, 90 L. Ed. 1031 (deposits for beverage bottles and cases); Fidelity-Philadelphia Trust Co., 23 T.C. 527, 528–531 (1954) (reserve for unclaimed dormant deposits); Roxy Custom Clothes Corp. v. United States, 171 F.Supp. 851, 145 Ct.Cl. 602 (1959) (writeoff of liability for cost of goods purchased when seller failed to present a bill); Chicago, R. I. & P. Ry. v. Commissioner, 47 F.2d 990 (7 Cir.1931), cert. denied 284 U.S. 618, 52 S.Ct. 7, 76 L.Ed. 527 (railroad's overcharges resulting from errors in fare computations, and uncashed checks and vouchers); Charleston & W. C. Ry. v. Burnet, 50 F.2d 342 (D.C.Cir.1931) (wages uncollected by employees). Cf. Northwestern States Portland Cement Co. v. Huston, 126 F. 2d 196, 198 (8 Cir.1942).

(d) Some statutory history lends support. Section 452 of the 1954 Code had no counterpart in prior tax statutes. It authorized, at a taxpayer's election, a method of deferring prepaid business income. It contained a provision, parallel to that in § 455(b), to the effect that when a taxpayer's liability with respect to the prepayment ceased the amount theretofore deferred was to be reported as income. Section 452 was repealed the following year. 69 Stat. 134. This statute, its short life, and its repeal because of the Treasury's insistence that it would have a disastrous impact upon the rev-

enue, were all noted and commented upon in the majority and dissenting opinions in American Auto. Ass'n v. United States, supra, pp. 694–698 and 703–711 of 367 U.S., pp. 1730–1733 and 1735–1739 of 81 S.Ct., 6 L.Ed.2d 1109, and again in the opinions in Schlude v. Commissioner, supra, pp. 134–135 and 139–140 of 372 U.S., pp. 604, 605 and 607 of 83 S.Ct., 9 L.Ed.2d 633. The repeal of § 452 was followed by the enactment three years later of § 455 with its application limited to prepaid subscriptions. Thus, while there was no deferral statute in being in 1957, it is evident that in the mind of Congress, as it formulated these statutes, there was an association of necessary taxation with the cessation of the reason for deferral. We think the same philosophy has valid and like application to income deferral under I.T. 3369.

■ (e) This taxable result is, of course, not avoided because of the tax free liquidation provisions of § 337 utilized by the taxpayer in 1957. The income component here is not part of the capital transaction. Commissioner v. Kuckenberg, 309 F.2d 202, 205–206 (9 Cir.1962), cert. denied 373 U.S. 909; West Seattle National Bank of Seattle v. Commissioner, supra, p. 50 of 288 F.2d 47; Central Bldg. & Loan Ass'n, 34 T.C. 447, 450–451 (1960); Ira Handelman, supra, p. 567 of 36 T.C.

(f) It is no answer to this result to say that the taxpayer's liability for future delivery of the newspaper was not absolutely terminated upon the sale to Prairie and, indeed, could not be because of the taxpayer's specific assumption in 1935 of Wallace's obligations and because of its direct contractual obligations to its own subscribers. It is true that a subscriber could make a refund demand upon the taxpayer. We think, however, that this was improbable in view of the taxpayer's liquidation and particularly because such a demand would likely be made on Prairie as the then publisher rather than on the taxpayer as the former one. Furthermore, if a demand were made upon the taxpayer it would then have a right to reimbursement from Prairie or,

if that were not collectible, a loss deduction, for what it might be worth, in the year of payment. It has long been said that "Taxation is an intensely practical matter * * *". Farmers Loan & Trust Co. v. Minnesota, 280 U.S. 204, 212, 50 S.Ct. 98, 100, 74 L.Ed. 371 (1930); Tyler v. United States, 281 U.S. 497, 503, 50 S.Ct 356, 74 L.Ed. 991 (1930); Lethert v. Culbertson's Cafe, Inc., 313 F.2d 506, 516 (8 Cir.1963); Helvering v. Cannon Valley Milling Co., 129 F.2d 642, 647 (8 Cir.1942); St. Louis Union Trust Co. v. Burnet, 59 F.2d 922, 927 (8 Cir.1932). It is our view that, as a practical matter, and despite theoretical continuing liability, the sale to Prairie extinguished the reasons, tax and otherwise, for the subscription reserves. Boston Consol. Gas Co. v. Commissioner, supra, p. 475 of 128 F.2d; Fidelity-Philadelphia Trust Co., supra, pp. 530–531 of 23 T.C.; Chicago, R. I. & P. Ry. v. Commissioner, supra, p. 992 of 47 F.2d. Cf. Commissioner v. Hansen, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959).

■ In deciding this phase of the issue we have not overlooked the rule that, because the subscription issue was brought into the case by the Commissioner only by way of new matter pleaded in the amendment to his answer, the burden of proof with respect to that issue is upon the Commissioner and not upon the taxpayer. Tax Court Rules of Practice, Rule 32; Helvering v. Terminal R. R. Ass'n, 89 F.2d 739, 742 (8 Cir.1937); Commissioner v. Hofheimer's Estate, 149 F.2d 733, 737 (2 Cir.1945); Commissioner v. Erie Forge Co., 167 F.2d 71, 74 (3 Cir. 1948); Commissioner v. Fleming, 155 F.2d 204, 205 (5 Cir.1946); Athens Roller Mills, Inc. v. Commissioner, 136 F.2d 125, 128 (6 Cir.1943). We feel, however, that this burden, so far as the evidence is concerned, has very definitely been met.

2. The deduction aspect. If property subject to a mortgage or other liability for which the owner is personally liable is sold for cash, the seller and the purchaser have a number of choices. The purchaser may pay the gross amount and the seller may then apply part of the

purchase cash in payment of the existing obligation. Or the purchaser may accept the property subject to the obligation, assume the debt, and pay it off according to its terms, the assumption then constituting part payment of the overall price. United States v. Hendler, 303 U.S. 564, 566, 58 S.Ct. 655, 82 L.Ed. 1018 (1938); Crane v. Commissioner, 331 U.S. 1, 13, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947). See Douglas v. Willcuts, 296 U.S. 1, 9, 56 S.Ct. 59, 101 A.L.R. 391 (1935). Or the purchaser may place his own mortgage of equal amount on the property and have the principal of the new mortgage applied in satisfaction of the old. In each of these cases the seller acquires something he did not have before: he either is relieved entirely of his personal obligation or he is placed in a position of ultimate secondary, rather than primary, liability with respect to it. And the amount of the cash purchase price he receives, net, has been reduced accordingly.

This taxpayer's posture with respect to the subscription reserves is comparable. By Prairie's assumption of the obligations which those reserves represented, the taxpayer's cash received on the sale of the business was reduced. This is just as much an out-of-pocket payment by the taxpayer as if it had first received the gross amount from Prairie and then repaid Prairie cash equal to the amount of the reserves. It is just as much an out-of-pocket payment by the taxpayer as if, in fiscal 1957, it had used other available cash of its own and on its own initiative refunded the subscribers the amounts of their unearned or redeemable subscriptions.

This either would constitute a deductible business expense under § 162(a) or it would operate in reduction, and here, by reason of identity of amounts, in elimination, of the income includable with the cessation of the need for the reserves. In either case, the result is the same. Cf. Bressner Radio, Inc., 28 T.C. 378, 384 (1957), as to that taxpayer's fiscal year 1951, reversed as to other years, 267 F.2d 520 (2 Cir.1959). Here again, and by authority of the cases cited above, this is not a part of the larger capital transaction which is tax free under § 337.

This, we think, is the simple answer to the tax accounting problem which has afforded the parties and ourselves so much difficulty in this litigation.

There has been some comment about Prairie's income tax situation in 1957. That, however, is another taxpayer and not this one. We venture to observe only that if Prairie was on the accrual system and also was entitled to the benefit of I.T. 3369, any income it may have realized in 1957 is offset by its deferment.

The decision of the Tax Court is therefore reversed and the case is remanded for recomputation of the taxpayer's income tax for its fiscal year 1957 in accordance with the views herein expressed.