SANDY ESTATE COMPANY (FORMERLY SADIK, INC.), A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1447–63. Filed December 31, 1964.

*George H. Koster*, for the petitioner.
*John O. Hargrove*, for the respondent.

The Commissioner determined deficiencies in tax against petitioner as follows:

| Fiscal year ended March 31— | Income tax | Accumulated earnings (sec. 531) tax |
|---|---|---|
| 1958 | $624.00 | $30,328.13 |
| 1959 | 8,584.54 | 28,431.80 |
| 1960 | 4,987.71 | 35,491.06 |

The only matter presently in issue is whether petitioner was availed of during the foregoing tax years for the purpose of avoiding the income tax in respect of its sole stockholder by permitting earnings and profits to accumulate instead of being divided or distributed. The correctness of other adjustments has not been presented for decision.

FINDINGS OF FACT

A stipulation of facts filed by the parties is incorporated herein by reference.

Petitioner was organized in 1933 as a Nevada corporation to operate properties in the San Francisco area transferred to it by George H. Sandy, its sole stockholder and president until the time of his death on September 9, 1960. Since the date of its incorporation petitioner has been in the business of owning, operating, and managing apartment houses, and in addition, beginning in 1944, in the business of making loans secured by real estate mortgages. Its original name, Sadik, Inc., was changed to Sandy Estate Co. on December 6, 1960. Its principal offices are in San Francisco, Calif., and it filed its income tax returns for the fiscal years March 31, 1958, 1959, and 1960, with the district director of internal revenue at San Francisco.

After Sandy's death all of his stock in the corporation went, by will, to two trusts and to a tax-exempt foundation. His sisters and nieces have incomes for life from part of his estate, and upon the death of all of the life beneficiaries, all of the shares of the corporation go to the foundation.

Petitioner's original capital was $1,000, which was increased by July 31, 1943, to $750,000 through the issuance from time to time of additional stock to Sandy for cash. Its capital was finally increased to $900,000 on November 30, 1944, upon the issuance of a stock dividend.

Petitioner's principal sources of income have been: (1) Rents from its apartment houses; (2) interest on mortgage loans (beginning in

1944) ; (3) interest on U.S. Government bonds (beginning in 1948) ; and (4) gains upon sales of some of petitioner's apartment houses.

For a number of years petitioner's officers consisted of George H. Sandy, Jack G. Horovitz, and Raymond B. Haizlip, an attorney. They were also directors. Sandy dominated the corporation and made or approved all important decisions relating to its affairs. Both Sandy and Horovitz devoted full time and Haizlip about half time to the corporation's business. Horovitz died on August 1, 1957.

Sandy examined every building the corporation considered buying, signed all agreements, and presided over meetings of the board of directors. No substantial repairs or improvements were made without his consent. He dealt with plumbers, contractors, and purveyors of equipment, and selected managers of the apartment buildings.

Horovitz was the corporation's principal outside representative. He inspected the apartment buildings, maintained contact with the managers, obtained estimates from repairmen and builders, and dealt with and obtained bids from carpethouses. Horovitz also made appraisals.

Upon Horovitz's death in August 1957, an attempt was made to replace him with another man, but the arrangement did not work out and he was released after a brief period. During the latter part of 1958 and early 1959, Sandy had suffered a heart attack and was unable to go to his office. The need to fill the void left by Horovitz became urgent, and in July 1959 Chester R. MacPhee became associated with the corporation as vice president and a director. Upon Sandy's death, MacPhee became president in September 1960.

In addition to the foregoing officers, the only other employees consisted of a full-time bookkeeper, a part-time clerk, and one manager for each of the apartment houses, 12 in number during the taxable years.

The salaries of the officers during the taxable years as shown on petitioner's returns were as follows: [1]

|  | Fiscal 1958 | Fiscal 1959 | Fiscal 1960 |
|---|---|---|---|
| Sandy | $34,999.99 | $45,000 | $25,000.01 |
| Horovitz | 4,400.00 | | |
| MacPhee | | | 15,800.00 |

The annual salaries of Sandy and MacPhee as of March 31, 1960, were $45,000 and $25,100, respectively. The salaries of the bookkeeper and part-time clerk were then $7,200 and $2,400, respectively, and the salaries of all 12 apartment managers were in the aggregate amount of $17,640.

---

[1] No salary was shown for Haizlip. His compensation apparently was in the form of legal fees.

In respect of the apartment house phase of petitioner's business, the principal employees or officers made sure that all of the rents were collected from the resident managers and deposited in the bank, that buildings were inspected frequently, and that repairs were made when needed. They carefully watched the list of slow-paying tenants, reviewed the cost of gas and electricity, and made comparisons with rents in the areas in which the apartment buildings were located so that its rents could be kept in line. Petitioner's officers on occasion made appraisals of apartment houses that were offered for sale to it.

A schedule of "Acquisitions and Dispositions of Apartment Buildings" by petitioner from 1934 to 1963 is as follows:

| Year ended March 31— | Number | | Total buildings owned (end of year) |
|---|---|---|---|
| | Acquired | Sold | |
| 1934 | 5 | | 5 |
| 1935 | 5 | 2 | 8 |
| 1936 | 5 | 3 | 10 |
| 1937 | 9 | 9 | 10 |
| 1938 | 4 | | 14 |
| 1939 | 1 | 5 | 10 |
| 1940 | 5 | 3 | 12 |
| 1941 | | | 12 |
| 1942 | | 1 | 11 |
| 1943 | | | 11 |
| 1944 | | | 11 |
| 1945 | 2 | 2 | 11 |
| 1946 | 4 | | 15 |
| 1947 | | 1 | 14 |
| 1948 | | 3 | 11 |
| 1949 | | 2 | 9 |
| 1950 | | | 9 |
| 1951 | 1 | | 10 |
| 1952 | 1 | | 11 |
| 1953 | | | 11 |
| 1954 | | | 11 |
| 1955 | 1 | | 12 |
| 1956 | | | 12 |
| 1957 | | | 12 |
| 1958 | | | 12 |
| 1959 | | | 12 |
| 1960 | | | 12 |
| 1961 | | 2 | 10 |
| 1962 | | 2 | [1] 8 |
| 1963 | | 1 | 7 |

[1] Does not include 1 commercial rental building acquired in fiscal year 1962 and presently on hand.

Of the 12 buildings owned during the tax years, 10 had been built during the years 1927–30, 1 in 1922, and 1 in 1913. They were mostly 6-story buildings, of concrete, class "C" construction, and contained from 24 to 56 apartments. In the aggregate they contained 455 apartments. The cost of petitioner's buildings, furniture and fixtures, and land, as shown in its balance sheet as of March 31, 1960, was as follows:

| | |
|---|---|
| Buildings | $1,281,631.63 |
| Furniture and fixtures | 274,693.92 |
| Land | 176,667.60 |

The buildings were in need of rehabilitation. The corporation recognized such need and had determined at least as early as the first

of the taxable years to enter into a program of rehabilitation and renovation. Except for one of the buildings, such program could not be carried out at one time, since such rehabilitation could be efficiently performed only as apartments became vacant. This program was being carried out during the tax years as well as during the following years up to the hearing of this case. In particular, as the program developed, it was determined that all of the kitchens had to be modernized and that all existing galvanized hot water pipes would have to be removed and replaced with copper pipes. The kitchen improvements contemplated new refrigerators, stoves, sinks, new cabinets, and floor covering as well as painting and decorating. The cost of the first few kitchen units completed was $2,000 each, and the cost of substituting copper for galvanized water pipes was estimated at $225,000. Other improvements were also planned, depending upon the particular building. Although some of the expenditures involved repairs or ordinary maintenance expenses that were a charge against current income, substantial portions thereof represented capital outlays or "additions." The amounts actually expended by the corporation during the fiscal years ended March 31, 1958–63, for repairs and "additions" to fixed assets were as follows:

| Fiscal year | Repairs | Additions |
| --- | --- | --- |
| 1958 | $42,311.19 | $7,872.34 |
| 1959 | 49,367.90 | 33,437.15 |
| 1960 | 48,322.06 | 45,821.18 |
| 1961 | 24,521.32 | 25,276.95 |
| 1962 | 52,426.88 | 57,355.96 |
| 1963 | 36,884.54 | 19,082.91 |
| Total | 253,833.89 | 189,746.49 |

In addition to its apartment house operation, the corporation in 1944 started a mortgage loan business. Most of its loans were secured by second mortgages on real estate. They were relatively short term and bore high interest rates, being of a marginal character. In view of such marginal character the making and servicing of the loans called for careful investigation and attention. Prior to approving a loan, an appraisal was made of the property, a title search was made, and title insurance obtained. At times petitioner's employees would make further investigations of matters revealed by the title report. Since payments on second mortgage loans were on a monthly basis, continued attention was required to make sure that the payments were made on time, to notify mortgagors who were in default, and ultimately to institute foreclosure proceedings where the defaults had not been cured. Moreover, in order to protect the corporation's interests in respect of its second mortgages it was necessary to keep in close touch with the holders of the first mortgages to make sure that

the prior loans were not in default; and it was also necessary to make periodic searches to determine whether the borrower had paid his taxes.

Petitioner advertised its mortgage loan business in the classified section of newspapers, and solicited loans through real estate brokers, real estate loan brokers, and title companies. It belongs to the San Francisco Real Estate Board, an organization of real estate brokers, and is listed as a mortgage loan company in the classified section of the telephone directory.

At least during the first 2 taxable years herein, virtually all appraisals in connection with proposed mortgage loans were made by officers of petitioner. The Majestic Mortgage Co. was organized in 1959 or 1960, with Sandy, MacPhee, and Haizlip as officers and sole stockholders, and thereafter the majority of "outside appraisals" for petitioner were made by that company. The Sandex Corp., organized in 1960 with MacPhee and Haizlip as equal stockholders, made some appraisals for petitioner and serviced its properties; it is no longer in existence.

The number of petitioner's mortgage loans outstanding as of the end of each of the fiscal years indicated and the total amounts of such loans plus accrued interest as of such dates were as follows:

| Fiscal year | Number of mortgage loans | Amount of loans plus accrued interest |
|---|---|---|
| 1952 | 41 | $756,166.13 |
| 1953 | 84 | 764,537.51 |
| 1954 | 99 | 691,568.40 |
| 1955 | 79 | 579,619.83 |
| 1956 | 146 | 676,991.10 |
| 1957 | 294 | 912,751.52 |
| 1958 | 385 | 886,701.79 |
| 1959 | 247 | 481,832.60 |
| 1960 | 224 | 1,220,738.74 |
| 1961 | 199 | 2,184,900.42 |

The decline in the mortgage loans as of March 31, 1959, was due in substantial part to the fact that during Sandy's illness the funds received from the loans paid off remained temporarily idle and were not immediately used to make new loans. The sharp increase in the amount of the funds used in petitioner's mortgage loan business after the fiscal year ending March 31, 1960, was due to MacPhee's more aggressive policy of expanding that phase of petitioner's business after Sandy's death. MacPhee sought to use not only any free funds of the corporation for that purpose but also committed it to a program of borrowing substantial amounts in order to expand the mortgage loan business.

During the period April 1, 1955, to March 31, 1963, petitioner failed to collect only one real estate loan in full. After partial recoveries on that loan its net loss was $260.77.

Petitioner has owned U.S. Government bonds in substantial amounts since 1948, and has owned $500,000 in such bonds continuously from 1951 at least through the end of its fiscal year 1960. During its fiscal year 1961, after Sandy's death, the holdings of such bonds were reduced to $200,000, and during the following year, fiscal 1962, all of the remaining bonds were disposed of. During each of the fiscal years 1954–60, petitioner received $12,500 interest on its U.S. Government bonds. These bonds were used by petitioner from time to time as collateral in obtaining short-term low-interest bank loans with which to finance its business operations; and it looked upon these bonds as a similar source of funds when considering possible business transactions requiring funds not otherwise available to it at the time. Throughout the period that petitioner owned these U.S. Government bonds its balance sheets disclose that it has not had any other "investment" in excess of $344.40.

Petitioner's balance sheets for the fiscal years 1933, 1938, 1943, 1953, 1958, 1959, 1960, 1961, and 1962 show the following:

| | Year ended— | | |
|---|---|---|---|
| | Apr. 1, 1933 | Mar. 31, 1938 | Mar. 31, 1943 |
| *Assets* | | | |
| Cash | | ($8,199.58) | ($20,743.33) |
| Accounts receivable (net) | | 9,682.88 | 5,460.21 |
| Investments | | | 131,561.70 |
| Deposit | | | |
| Prepaid interest | | 157.97 | |
| Prepaid insurance | | 7,466.23 | 4,539.61 |
| Buildings | $109,935.15 | 1,096,710.61 | 874,552.54 |
| Furniture and fixtures | 900.00 | 165,611.90 | 141,592.33 |
| Building account | | | |
| Reserve for depreciation | | (104,464.90) | (268,332.28) |
| Land | 11,000.00 | 119,042.00 | 130,304.03 |
| | 121,835.15 | 1,286,007.11 | 998,934.81 |
| *Liabilities* | | | |
| Accounts payable | | 8,891.86 | 4,685.57 |
| Notes payable | 28,335.15 | | |
| Lease deposits—prepaid rent | | 4,878.77 | |
| Accrued expenses | | | |
| Mortgages payable | 92,500.00 | 1,241,515.77 | 369,453.79 |
| Unrealized gross profit | | 6,817.38 | |
| Capital stock | 1,000.00 | 1,000.00 | 500,000.00 |
| Earned surplus | | 22,903.33 | 124,795.45 |
| | 121,835.15 | 1,286,007.11 | 998,934.81 |

| | Year ended March 31— | | |
| --- | --- | --- | --- |
| | 1953 | 1958 | 1959 |
| *Assets* | | | |
| Cash | $12,743.10 | $166,029.69 | $682,686.35 |
| Notes and accounts receivable (net) | 764,537.51 | 886,701.79 | 481,832.60 |
| Investments | 500,250.00 | 500,250.00 | 500,250.00 |
| Deposit | | | |
| Prepaid interest | | | |
| Prepaid insurance and taxes | 14,672.48 | 19,911.77 | 11,509.77 |
| Accrued rent receivable | | | |
| Buildings | 1,090,912.19 | 1,271,772.48 | 1,281,631.63 |
| Furniture and fixtures | 183,887.32 | 208,061.13 | 231,639.13 |
| Autos | 9,418.14 | 10,055.54 | 5,751.60 |
| Reserve for depreciation | (514,097.20) | (767,536.39) | (820,615.99) |
| Land | 161,310.85 | 176,667.60 | 176,667.60 |
| | 2,223,634.39 | 2,471,913.61 | 2,551,352.69 |
| *Liabilities* | | | |
| Accounts payable | 4,984.19 | 3,357.67 | 3,392.16 |
| Notes payable | 200,000.00 | | |
| Lease deposit—prepaid rent | | | |
| Mortgages payable | | | |
| Federal income tax payable | 67,019.18 | 106,842.87 | 99,741.31 |
| Unrealized gross profit | 170,653.45 | 65,169.04 | 18,851.42 |
| Capital stock | 900,000.00 | 900,000.00 | 900,000.00 |
| Reserve for rehabilitation | 120,000.00 | 120,000.00 | 120,000.00 |
| Earned surplus | 760,977.57 | 1,276,544.03 | 1,409,367.80 |
| | 2,223,634.39 | 2,471,913.61 | 2,551,352.69 |

| | Year ended March 31— | | |
| --- | --- | --- | --- |
| | 1960 | 1961 | 1962 |
| *Assets* | | | |
| Cash | $168,846.25 | $162,734.49 | $102,092.63 |
| Notes and accounts receivable (net) | 1,220,738.74 | 2,184,900.42 | 3,176,285.84 |
| Investments | 500,344.40 | 200,344.40 | 344.40 |
| Prepaid insurance and taxes | 30,495.12 | 34,415.53 | 23,761.50 |
| Buildings | 1,281,631.63 | 1,189,342.42 | 990,076.36 |
| Furniture and fixtures | 274,693.92 | 260,017.30 | 253,740.55 |
| Automobiles | 8,517.99 | 3,594.26 | 3,594.26 |
| Reserve for depreciation | (880,848.44) | (834,347.92) | (765,420.58) |
| Land | 176,667.60 | 163,667.60 | 162,500.93 |
| | 2,781,087.21 | 3,364,668.50 | 3,946,975.89 |
| *Liabilities* | | | |
| Accounts payable and accrued expenses | 5,052.79 | 38,194.87 | 4,729.42 |
| Accrued profit-sharing fund contribution payable | | | 7,700.00 |
| Notes payable | 100,000.00 | 200,000.00 | 322,800.00 |
| Federal income tax payable | 116,281.72 | 133,797.38 | 188,607.38 |
| Unrealized gross profit | | 276,614.43 | 267,596.73 |
| Capital stock | 900,000.00 | 900,000.00 | 900,000.00 |
| Reserve for rehabilitation | 120,000.00 | 120,000.00 | 120,000.00 |
| Paid-in surplus | 94.40 | 94.40 | 94.40 |
| Earned surplus | 1,539,658.30 | 1,695,967.42 | 2,135,447.96 |
| | 2,781,087.21 | 3,364,668.50 | 3,946,975.89 |

The corporation's "Statements of Income" for the years ended March 31, 1958, 1959, 1960, 1961, and 1962, show the following:

| | Year ended March 31— | | | | |
|---|---|---|---|---|---|
| | 1958 | 1959 | 1960 | 1961 | 1962 |
| **Gross Income:** | | | | | |
| Rents | $477,452.32 | $494,715.65 | $520,884.40 | $505,145.26 | $461,956.00 |
| Dividends | | | 1,416.20 | 759.20 | 759.20 |
| Interest: | | | | | |
|   On notes, mortgages, loans, bank deposits, etc. | 95,614.49 | 80,492.91 | 96,068.84 | 144,815.37 | 219,654.05 |
|   On U.S. Government bonds issued on or after Mar. 1, 1941 | 12,500.00 | 12,500.00 | 12,500.00 | 12,520.60 | 4,126.78 |
| Net long-term capital gains | 10,535.62 | 46,515.61 | 18,851.42 | 49,022.37 | 440,254.43 |
| Bad debt recovery | | | 12,000.00 | | 14,256.91 |
| Miscellaneous income | 278.37 | | | 1,790.07 | 462.16 |
|     Total income | 596,380.80 | 634,224.17 | 661,720.86 | 714,052.87 | 1,141,469.53 |
| **Deductions:** | | | | | |
| Compensation of officers | 39,399.99 | 45,000.00 | 40,800.01 | 39,408.32 | 39,448.70 |
| Salaries and wages | 53,160.23 | 59,172.16 | 57,228.22 | 58,324.96 | 60,034.36 |
| Repairs | 42,311.19 | 49,367.90 | 48,322.06 | 24,521.32 | 52,426.88 |
| Interest | 2,725.02 | | 3,322.21 | 10,935.18 | 25,825.85 |
| Taxes, other than Federal income taxes | 71,771.48 | 75,159.55 | 83,042.68 | 84,433.10 | 82,554.20 |
| Rent | | | | 2,081.10 | 6,384.94 |
| Contributions | 3,528.50 | 6,613.00 | 1,630.00 | 2,930.00 | 1,116.40 |
| Amount contributed under profit-sharing plan | | | | | 8,200.00 |
| Depreciation | 54,129.25 | 56,881.53 | 60,232.45 | 59,503.29 | 54,046.89 |
| Other deductions | 107,840.76 | 110,105.95 | 119,071.01 | 120,629.09 | 124,293.55 |
|     Total deductions | 374,866.42 | 402,300.09 | 413,648.64 | 402,766.36 | 454,331.77 |
|   Net income | 221,514.38 | 231,924.08 | 248,072.22 | 311,286.51 | 687,137.76 |

Petitioner's gross income, deductions, net income, dividends paid (other than stock dividends), and accumulated earnings and profits [2] as of the end of the fiscal years 1934–63 were as follows:

| Fiscal year | Gross income | Deductions | Net income | Dividends paid | Accumulated earnings and profits |
|---|---|---|---|---|---|
| 1934 | $52,656.26 | $55,675.71 | ($3,019.45) | | ($3,019.45) |
| 1935 | 123,415.82 | 126,614.92 | (3,199.10) | | (6,218.55) |
| 1936 | 162,382.74 | 159,308.49 | 3,074.25 | | (3,144.30) |
| 1937 | 288,337.96 | 253,793.35 | 34,544.61 | | 31,334.65 |
| 1938 | 303,268.04 | 286,725.44 | 16,542.60 | $15,000 | 22,903.33 |
| 1939 | 416,097.16 | 285,829.43 | 130,267.73 | 40,000 | 87,595.23 |
| 1940 | 250,298.32 | 245,130.18 | 5,168.14 | | 92,505.38 |
| 1941 | 243,806.14 | 240,558.09 | 3,248.05 | 4,000 | 89,915.46 |
| 1942 | 243,270.03 | 234,217.57 | 9,052.46 | 1,000 | 89,169.96 |
| 1943 | 270,838.43 | 233,230.87 | 37,607.56 | | 124,795.45 |
| 1944 | 301,917.40 | 228,105.90 | 73,811.50 | | 186,154.38 |
| 1945 | 380,084.56 | 190,125.07 | 189,959.49 | | 303,031.09 |
| 1946 | 284,440.91 | 201,190.32 | 83,250.59 | | 348,531.68 |
| 1947 | 516,835.14 | 220,282.80 | 296,552.34 | | 562,584.02 |
| 1948 | 334,074.67 | 231,007.91 | 103,066.76 | | 631,326.23 |
| 1949 | 376,735.23 | 193,133.28 | 183,601.95 | | 753,001.14 |
| 1950 | 328,385.07 | 230,791.42 | 97,593.65 | | 814,706.89 |
| 1951 | 363,376.56 | 253,115.27 | 110,261.29 | | 878,224.67 |
| 1952 | 405,479.03 | 285,140.83 | 120,338.20 | | 944,585.98 |
| 1953 | 460,723.79 | 307,313.02 | 153,410.77 | | 1,030,977.57 |
| 1954 | 482,394.13 | 312,218.22 | 170,175.91 | | 1,126,281.03 |
| 1955 | 511,886.53 | 339,465.89 | 172,420.64 | | 1,220,821.17 |
| 1956 | 539,643.42 | 348,305.66 | 191,337.76 | | 1,327,623.59 |
| 1957 | 563,462.90 | 367,718.80 | 195,744.10 | | 1,429,934.02 |
| 1958 | 596,380.80 | 374,866.42 | 221,514.38 | | 1,546,544.03 |
| 1959 | 634,224.17 | 402,300.09 | 231,924.08 | | 1,679,367.80 |
| 1960 | 661,720.86 | 413,648.64 | 248,072.22 | | 1,809,658.30 |
| 1961 | 714,052.87 | 402,766.36 | 311,286.51 | | 1,965,967.42 |
| 1962 | 1,141,469.53 | 454,331.77 | 687,137.76 | | 2,405,447.96 |
| 1963 | 884,479.24 | 415,110.69 | 469,368.55 | 36,000 | 2,625,950.94 |

The net capital gains upon sales of petitioner's properties (as reduced by taxes applicable thereto), which were included in petitioner's accumulated earnings and profits, were as follows:

*Fiscal year*

| | |
|---|---:|
| 1934 | ------------ |
| 1935 | $7, 865. 52 |
| 1936 | 4, 548. 43 |
| 1937 | 65, 098. 49 |
| 1938 | ------------ |
| 1939 | 141, 582. 67 |
| 1940 | 6, 918. 75 |
| 1941 | 2, 962. 60 |
| 1942 | 1, 060. 51 |
| 1943 | 2, 622. 94 |
| 1944 | 27, 274. 62 |
| 1945 | 94, 790. 13 |
| 1946 | 19, 103. 95 |
| 1947 | 174, 306. 99 |
| 1948 | 26, 114. 39 |
| 1949 | 61, 524. 54 |
| 1950 | 23, 736. 40 |
| 1951 | 13, 200. 36 |
| 1952 | 6, 700. 38 |
| 1953 | 8, 534. 40 |
| 1954 | 23, 130. 53 |
| 1955 | 13, 321. 26 |
| 1956 | 26, 286. 61 |
| 1957 | 8, 203. 50 |
| 1958 | 7, 901. 71 |
| 1959 | 34, 886. 71 |
| 1960 | 14, 138. 56 |
| 1961 | 36, 766. 78 |
| 1962 | 330, 190. 82 |
| 1963 | 135, 172. 54 |
| Total | 1, 317, 945. 09 |

Part, but not all, of the foregoing net gains was reinvested in other apartment properties purchased by petitioner.

Petitioner did not make any advances to its sole stockholder, Sandy, at any time during its existence. On the other hand, Sandy made a

---

[2] The evidence was in terms of "earned surplus," rather than "earnings and profits," but the parties have treated earned surplus as representing earnings and profits. However, the evidence required two adjustments to convert earned surplus to earnings and profits: (1) A $150,000 stock divided during fiscal 1945 was charged against earned surplus on the petitioner's books, and it was necessary to add this amount back in order properly to reflect accumulated earnings and profits; and (2) two amounts of $60,000 each were transferred on petitioner's books during fiscal 1946 and 1947 from earned surplus to a "reserve for rehabilitation," and it was necessary to add these amounts back in order properly to reflect accumulated earnings and profits.

number of advances to petitioner. The following table shows petitioner's notes payable to Sandy and others as of the dates indicated:

| | Notes payable | |
|---|---|---|
| | George H. Sandy [1] | Other notes payable |
| Apr. 1, 1933 [2] | $15,583.15 | $105,252.00 |
| Mar. 31, 1934 | 196,685.28 | 96,000.00 |
| Mar. 31, 1935 | 307,733.88 | 191,481.87 |
| Mar. 31, 1936 | 254,892.32 | 359,155.89 |
| Mar. 31, 1937 | 343,866.40 | 527,406.93 |
| Mar. 31, 1938 | 465,496.66 | 705,537.78 |
| Mar. 31, 1939 | 441,988.50 | 360,950.00 |
| Mar. 31, 1940 | 55,226.62 | 426,048.00 |
| Mar. 31, 1941 | 132,726.62 | 310,143.21 |
| Mar. 31, 1942 | 151,304.12 | 245,400.00 |
| Mar. 31, 1943 | 220,304.12 | 91,000.00 |
| Mar. 31, 1944 | | 51,000.00 |
| Mar. 31, 1945 | | 74,000.00 |
| Mar. 31, 1946 | 165,000.00 | 162,400.00 |
| Mar. 31, 1947 | 50,000.00 | 50,000.00 |
| Mar. 31, 1948 | 50,000.00 | |
| Mar. 31, 1949 | 50,000.00 | |
| Mar. 31, 1950 | 50,000.00 | |
| Mar. 31, 1951 | 50,000.00 | 300,000.00 |
| Mar. 31, 1952 | | 330,000.00 |
| Mar. 31, 1953 | | 200,000.00 |
| Mar. 31, 1954 | | 47,346.47 |
| Mar. 31, 1955 | | 140,000.00 |
| Mar. 31, 1956 | | |
| Mar. 31, 1957 | | 100,000.00 |
| Mar. 31, 1958 | | |
| Mar. 31, 1959 | | |
| Mar. 31, 1960 | 100,000.00 | |
| Mar. 31, 1961 | 200,000.00 | |
| Mar. 31, 1962 | | 322,800.00 |
| Mar. 31, 1963 | | 420,000.00 |

[1] Including notes payable to proprietorships of "George H. Sandy Co." and "The Majestic"; the estate of George H. Sandy; and Laura M. Sandy, spouse.
[2] Opening balance sheet after incorporation on Mar. 15, 1933.

During the years involved herein, petitioner had two insurance policies covering liabilities in respect of personal injuries and property damage in the course of its apartment house operations. The maximum coverage of these policies was in the amount of $300,000 for damages to any one individual, and $700,000 for damages from any single occurrence. Petitioner could have obtained additional public liability insurance had it desired to do so.

The following are the amounts of actual liabilities arising from property damages and personal injuries arising from the corporation's activities in the years ended March 31, 1958, 1959 and 1960:

| | |
|---|---|
| May 7, 1957, Auto collision | $89.52 |
| December 24, 1957, Auto property damage | 13.06 |
| January 11, 1958, 1770 Pine St., bodily injury | 450.00 |
| July 19, 1958, 1290 Grove St., bodily injury | 75.00 |
| September 8, 1958, 1918 Lake Shore, bodily injury | 1,000.00 |
| February 2, 1959, 2201 Pacific Ave., bodily injury | 122.40 |
| March 30, 1959, 1755 Van Ness Ave., bodily injury | 100.00 |
| May 7, 1959, 1755 Van Ness Ave., bodily injury | 50.00 |
| November 4, 1959, 1918 Lake Shore, bodily injury | 10.00 |

On March 31, 1960, petitioner's fire insurance coverage on its apartment houses was in the amount of $4,352,850. Owners of apartment houses located in the San Francisco area do not customarily carry general catastrophe insurance, and petitioner did not carry any such insurance. Petitioner's losses of that nature, and all other kinds of damage not covered by insurance, which arose from its apartment house operations for the period 1958 through 1963, did not exceed $10,000.

Petitioner did not earmark any portion of its surplus for contingencies arising from its apartment house operations, other than to establish a "reserve for rehabilitation" which remained on its books intact and no expenditures actually made for rehabilitation were charged against it.

In the files of F. T. Andrews & Co., Sandy's accountants, there was a copy of a letter dated December 20, 1950, addressed to Sandy and signed by F. T. Andrews & Co., which read in part as follows:

At your request we have computed the estimated additional federal income taxes which would accrue to you and Mrs. Sandy should dividends be paid by Sadik, Inc. We have also computed the amount of surtax under Section 102 which would be saved by Sadik, Inc. through the payment of dividends, should such a surtax be imposed upon the corporation.

\*   \*   \*   \*   \*   \*   \*

| Dividend | Percent of corporation net income | Additional tax to George H. and Laura M. Sandy | Possible saving of sec. 102 surtax |
|---|---|---|---|
| $6,000 | 10 | $3,148 | $1,650 |
| $15,000 | 25 | 8,118 | 4,125 |
| $30,000 | 50 | 16,844 | 8,250 |
| $45,000 | 75 | 29,324 | 12,375 |
| $60,000 | 100 | 35,968 | 16,500 |

From the above it appears that the tax cost of paying even a small dividend would greatly exceed the cost of paying surtax under Section 102.

This letter was introduced in evidence by agreement of the parties but there was no agreement between them that the original was actually received or sent, although petitioner's counsel agreed that "it might be assumed that it was sent."

The individual income tax returns of George and Laura Sandy reflected the following:

| Taxable year ended January 31— | Taxable income | Income tax | Highest rate of tax |
|---|---|---|---|
| | | | *Percent* |
| 1959 | [1] $56,118.32 | [2] $23,071.29 | 62 |
| 1960 | [1] 64,043.03 | [2] 27,372.16 | 65 |
| 1961 | [1] 31,322.64 | [2] 9,607.75 | 47 |

[1] Includes salary and interest received from petitioner.
[2] After allowance for dividends-received credit.

On or about October 17, 1962, respondent notified petitioner of his intention to issue a deficiency notice based on section 531 of the 1954 Code for the taxable years now before us. On or about November 13, 1962, pursuant to section 534 of the 1954 Code, petitioner submitted a "Statement" (incorporated herein by reference) to respondent setting forth certain "grounds" and "facts" in opposition to the section 534 deficiency proposed by respondent. Respondent then mailed to petitioner a notice of deficiency dated February 28, 1963.

During the years under review, petitioner did not permit its earnings and profits to accumulate beyond the reasonable needs of its business.

Petitioner was not availed of during the years under review for the purpose of preventing the imposition of surtax upon its sole stockholder through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed.

### OPINION

RAUM, *Judge:* The challenged deficiencies were determined under section 531 of the Internal Revenue Code of 1954, which imposes a special surtax upon corporations formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed.[3] Section 534 provides that if the taxpayer, after notification, submits a "statement of the grounds (together with facts sufficient to show the basis thereof)" upon which it relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business,[4] then the burden of proof with respect to "such allegation" shall be on the Government.[5]

---

[3] SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

(1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus

(2) 38½ percent of the accumulated taxable income in excess of $100,000.

SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

[4] The term "reasonable needs of the business" is defined in sec. 537 to include "the reasonably anticipated needs of the business."

[5] SEC. 534. BURDEN OF PROOF.

(a) GENERAL RULE.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings

However, the ultimate burden of proving that the corporation was not availed of for the prohibited statutory purpose is upon the petitioner. *Pelton Steel Casting Co.*, 28 T.C. 153, 183, 184, affirmed 251 F. 2d 278 (C.A. 7), certiorari denied 356 U.S. 958; *Wellman Operating Corporation*, 33 T.C. 162, 182; *Commissioner* v. *Young Motor Co.*, 316 F. 2d 267, 270–272 (C.A. 1), reversing a Memorandum Opinion of this Court; [6] but cf. *Electric Regulator Corporation* v. *Commissioner*, 336 F. 2d 339 (C.A. 2), reversing 40 T.C. 757.

1. Petitioner submitted a timely statement which, as we read it, sets forth four grounds to justify the accumulation of earnings and profits in this case, namely, (i) to defray the cost of rehabilitating its apartment houses, (ii) to set up a self-insurance reserve against the hazards and risks of apartment house operations, (iii) to finance expansion of its apartment house operations by acquiring additional buildings, and (iv) to provide adequate funds for its mortgage loan business. Without deciding whether the foregoing grounds and "facts" alleged in support thereof were sufficient to shift the burden of proof to the Commissioner, cf. *Wellman Operating Corporation*, 33 T.C. 162, 184–185, we hold, first, that even assuming that the burden has been shifted, the Commissioner has overcome it as to the two middle grounds, and second, regardless of where the burden may be, petitioner has adequately established the first and fourth grounds by the evidence presented in this proceeding.

(a) We may dispose of the second and third grounds summarily. The evidence convincingly establishes that these grounds are spurious. Petitioner carried over $4,300,000 fire insurance on its buildings; it carried liability insurance in respect thereof with high coverage limits,

and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

(1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or

(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

(b) NOTIFICATION BY SECRETARY.—Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. In the case of a notice of deficiency to which subsection (e)(2) applies and which is mailed on or before the 30th day after the date of the enactment of this sentence, the notification referred to in the preceding sentence may be mailed at any time on or before such 30th day.

(c) STATEMENT BY TAXPAYER.—Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

[6] There is no contradiction between the two burdens, which on the surface appear to bear a confusing relationship to each other. The reasonable needs of the business constitute a factor to be taken into account in determining whether the earnings have been accumulated for the purpose of avoiding tax. Cf. *Commissioner* v. *Young Motor Co.*, 316 F. 2d 267 (C.A. 1). Of course, the extent to which it may affect the ultimate conclusion will depend upon the facts of the particular case.

and losses actually sustained during the taxable years were comparatively negligible; it was not the practice in the San Francisco area to carry catastrophe insurance, petitioner's losses of that character have been relatively minor, and we are convinced that it did not in fact accumulate any earnings or profits as a reserve for such purpose.

As to the ground that petitioner needed funds to acquire additional apartment buildings, we conclude on the evidence that petitioner's apartment house operations had been stabilized at least several years prior to the taxable years, that no new apartment houses were in fact acquired after 1955; and that petitioner had no plan or program calling for the acquisition of any additional apartment houses. Cf. *Nemours Corporation*, 38 T.C. 585, 604, affirmed 325 F. 2d 559 (C.A. 3). We are satisfied that no earnings or profits were in fact accumulated during the taxable years for this purpose.

(b) As to the first and fourth grounds, we think that petitioner effectively established that the accumulation was within the reasonable needs of its business, even if the burden of proof were upon it in this respect. We need not review the evidence in detail as to the first ground relating to rehabilitation needs. It establishes to our satisfaction that petitioner's apartment buildings were rundown; that they required considerable renovation and rehabilitation; that firm decisions had been taken to embark upon a program of rehabilitation that was in fact being carried out during and beyond the taxable years; and that substantial amounts of money were required for this purpose.

The record also clearly supports petitioner's position in respect of its fourth ground. It was actively engaged in a healthy and vigorous mortgage loan business, which, it is true, had a sharp, but only a temporary decline in 1959 as a result of Sandy's prolonged illness, and then rebounded to new heights the following year, even prior to MacPhee's still more vigorous policy of expansion with the use of borrowed funds. The nub of the Commissioner's argument in respect of these activities is that they did not constitute a business at all but represented merely liquid investments of surplus funds. We disagree. These mortgage loans were not simply isolated investments, unrelated to petitioner's business. Cf. *J. Gordon Turnbull, Inc.*, 41 T.C. 358, 377; *Raymond I. Smith, Inc.*, 33 T.C. 141, 152–154, affirmed 292 F. 2d 470 (C.A. 9), certiorari denied 368 U.S. 948; *J. M. Perry & Co.* v. *Commissioner*, 120 F. 2d 123, 126 (C.A. 9), affirming a Memorandum Opinion of this Court. Taking into account the number of such loans, the extensive and continuous activities in relation to them, and the manner in which such activities were carried on, we have no doubt that petitioner was engaged in a mortgage loan business, calling for the use of substantial funds. Bearing in mind that the "reasonable needs of the business" include also the "reason-

ably anticipated needs of the business," section 537, that the business was a growing one and that it in fact reached its highest level up to that time in the last of the taxable years before us, we are convinced that petitioner has carried its burden in respect of this ground, if it ever had any such burden.

2. Notwithstanding grounds justifying an accumulation for the reasonable needs of the business, the burden still remains upon petitioner to establish that the earnings and profits in fact were not permitted to accumulate for the purpose of avoiding tax. See *supra*, p. 373. We think it has carried that burden here. The evidence satisfies us that earnings and profits were permitted to accumulate for the reasons embodied in the first and fourth grounds, as well as for the general conduct of petitioner's business, and not for the purpose of avoiding tax.

At the outset of our consideration of this issue it is well to note that the large amount of earnings and profits on petitioner's books does not of itself establish that there has been an unreasonable accumulation. The relevant criteria in this respect were stated in *Smoot Sand & Gravel Corporation* v. *Commissioner*, 274 F. 2d 495 (C.A. 4), as follows (pp. 500–501):

Thus, the size of the accumulated earnings and profits or surplus is not the crucial factor; rather, it is the reasonableness and nature of the surplus. Part of the surplus may be justifiably earmarked in the form of reserves, for specific, necessary business needs. Again, to the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity. * * * Where, on the other hand, the accumulation of surplus is reflected in liquid assets in excess of the immediate or reasonably foreseeable business needs of the corporation, there is a strong indication that the purpose of the accumulation is to prevent the imposition of income taxes upon dividends which would have been distributed to the shareholders. * * *

A considerable amount of petitioner's earnings and profits had found their way directly into its business. Thus, a substantial portion of its capital gains reflected in its surplus account had been reinvested in apartment properties, and other earnings and profits were used in making loans in petitioner's mortgage loan business.

The Government, however, refuses to recognize the latter use of funds as related to petitioner's business and treats it simply as a liquid investment serving as a device to retain the corporation's earnings and profits for the purpose of avoiding tax. We rejected that view, *supra*, in our discussion of the grounds set forth in petitioner's statement. Of course, the mortgage loans were not part of or even related to petitioner's apartment house operations. But the mortgage loan activities were of such magnitude and character as to constitute a business in and of themselves. A corporation may have more than

one business, and we think that beginning in 1944, petitioner conducted two businesses, one an apartment house business and the other a mortgage loan business. In view of this conclusion, much of the Government's case collapses. Also, in view of this conclusion, we cannot take seriously the Government's suggestion that dividends could have been paid to Sandy by distributing some of the mortgage loans to him. Unlike the situation in *Whitney Chain & Mfg. Co.*, 3 T.C. 1109, affirmed 149 F. 2d 936 (C.A. 2), upon which the Government relies (see also *Nemours Corporation*, 38 T.C. 585, 602–604, affirmed 325 F. 2d 559 (C.A. 3)), distribution of these loans would have constituted a *pro tanto* liquidation or destruction of the mortgage loan business. Certainly, the statute does not force the corporation to accept any such alternative to avoid the accumulated earnings tax.

The only other items of consequence on petitioner's balance sheets for the taxable years that could not be classified as direct business assets were "Cash" and "Investments," as follows:

| Fiscal year— | Cash | Investments |
|---|---|---|
| 1958 | $166,029.69 | $500,250.00 |
| 1959 | 682,686.35 | 500,250.00 |
| 1960 | 168,846.25 | 500,344.40 |

As to cash, apart from the disproportionately large amount in 1959, attributable to a temporary accumulation when loan activities were suspended during Sandy's illness, the amounts involved appear to be entirely reasonable considering the nature and extent of petitioner's activities. Petitioner's current or "quick" liabilities, consisting of accounts payable, notes payable, and Federal income taxes payable, as of the end of each of the fiscal years 1958–60, were in the aggregate amount of $110,200.54, $103,133.47, and $221,334.51, respectively. Taking such current liabilities into account, cf. *I. A. Dress Co.*, 32 T.C. 93, 102, affirmed 273 F. 2d 543 (C.A. 2), certiorari denied 362 U.S. 976; *Lion Clothing Co.*, 8 T.C. 1181, 1190, acq. 1947–2 C.B. 3, as well as petitioner's substantial operating expenses disclosed in our findings, cf. *J. L. Goodman Furniture Co.*, 11 T.C. 530, 534–535, acq. 1949–1 C.B. 2; *F. E. Watkins Motor Co.*, 31 T.C. 288, 299, fn. 7, acq. 1959–1 C.B. 5; *James M. Pierce Corporation*, 38 T.C. 643, 653–654, reversed on other grounds 326 F. 2d 67 (C.A. 8), acq. 1963–2 C.B. 5, and giving appropriate weight to the fact that the 1959 cash level was only temporary, we conclude that the cash on hand as of the end of each of the taxable years was reasonable in amount and was not retained for the purpose of avoiding tax.

The investment item consisted primarily of $500,000 in Government bonds which had been held for a period of some 8 or 10 years prior to the tax years before us. This would ordinarily be a suspi-

cious circumstance, and calls for careful scrutiny. However, the record shows that these bonds, although not a direct business asset, were nevertheless repeatedly used by petitioner for business purposes. Petitioner from time to time was in need of funds for its business, and these bonds were used as collateral to obtain low-interest bank loans to supply such funds. The significance of the bonds is further weakened by petitioner's program for rehabilitating its apartment houses and the need for additional funds in its growing mortgage loan business. In the circumstances we conclude that these bonds were not retained for the purpose of avoiding Sandy's income tax.

Considering the record as a whole we have found that petitioner's earnings and profits were not permitted to accumulate for the purpose of preventing the imposition of surtax upon its sole stockholder. One of the factors, in addition to those discussed above, that fortifies this conclusion is that over the years petitioner made no loans or advances to Sandy. Thus, this is not a case where earnings have in fact been made available to the stockholder in the form of "loans," cf. *Nemours Corporation, supra;* to the contrary, it was he who from time to time made substantial loans to petitioner.

The one troubling item of evidence pointing in the other direction is a copy of a letter found in the files of Sandy's accountants, and reproduced in relevant part in our findings. It was dated in 1950, some years prior to the period before us, but, if taken at face, would indicate that Sandy was preoccupied with the accumulated earnings tax and was considering the competing disadvantages of increasing his own surtaxes as against subjecting the corporation to the accumulated earnings tax. However, there is no evidence that Sandy ever received the letter nor is there even any solid evidence that it was ever mailed. The state of the record in this connection is unsatisfactory and when the matter is considered in conjunction with all of the materials discussed above, we think the scales tip in petitioner's favor.

*Decision will be entered under Rule 50.*