Vuono-Lione, Incorporated (formerly The Vuono Construction Company) v. Commissioner. Anna Vuono v. Commissioner.
Vuono-Lione, Inc. v. Commissioner
Docket Nos. 2314-62, 2316-62.
United States Tax Court
T.C. Memo 1965-96; 1965 Tax Ct. Memo LEXIS 232; 24 T.C.M. (CCH) 506; T.C.M. (RIA) 65096; April 14, 1965
*232 Held: (1) The corporate petitioner was not availed of during the taxable years for the purpose of avoiding the income tax in respect of its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed; (2) Anna did not realize dividend income by reason of her net withdrawals from the corporation during the taxable years. Jacquin D. Bierman, 666 5th Ave., New York, N. Y. , and Stanley Pressment, for the petitioners. Frederick A. Griffen, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income taxes of petitioners for the years and in the amounts as follows: Dkt. No. 2314-62
Dkt. No. 2316-62
Year
Vuono-Lione, Inc.
Anna Vuono
1957
$30,607.96
$7,154.55
1958
51,862.64
492.70
1959
4,361.08
7,210.80
Certain issues involving the corporate petitioner raised by the pleadings have been settled by stipulation which will be given effect under Rule 50. The remaining issues in these consolidated cases are: (1) Whether the corporate petitioner was availed of during the taxable years for the purpose of avoiding the income tax in respect of its shareholders by permitting earnings and profits to accumulate *233 instead of being divided or distributed, and (2) whether the individual petitioner realized dividend income to the extent of net withdrawals from the corporate petitioner in the taxable years in issue. Findings of Fact Some of the facts have been stipulated and the stipulation, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Vuono-Lione, Incorporated (sometimes hereinafter referred to as the corporation), formerly named the Vuono Construction Company, is a corporation organized November 14, 1913, under the laws of the State of Connecticut, with its principal office at Stamford, Connecticut. Its Federal income tax returns for the taxable years 1957, 1958 and 1959 were filed with the district director of internal revenue at Hartford, Connecticut. Petitioner Anna Vuono is an individual who resides in Stamford, Connecticut. Her Federal income tax returns for the calendar years 1957 to 1959, inclusive, were filed with the district director of internal revenue at Hartford, Connecticut. The corporation is engaged in business as a general building contractor. Prior to its incorporation in 1913, its business was conducted as a partnership which *234 was formed by two brothers, Charles Vuono and Joseph Vuono, Anna's husband. The corporation was formed with net assets of approximately $20,000 for which 800 shares of stock were issued, 400 shares to each of the two brothers. Charles was the president of the corporation and Joseph served as secretary and treasurer. In 1933 Joseph transferred by gift 398 of the 400 shares he owned in the corporation to Anna. In October 1935 Charles died and Anna was elected president. Joseph continued to serve as secretary and treasurer until his death in 1936. Anna continued as president of the corporation until 1957, when she was 73 years of age. Frederick M. Lione, husband of Eva Vuono, one of Anna's daughters, has been associated with the corporation since 1935 and has been its president since 1957. From 1957, he has been its principal operating executive and has been in charge of all phases of the corporation's business activity. During 1957 to 1959, as well as for years prior and to the present, he has been principally responsible for obtaining new business for the corporation. At the time of his death in 1936, Joseph owed the corporation $55,536.18. In 1954, this amount was cancelled and charged *235 to surplus. On January 21, 1936, the corporation retired 400 shares of capital stock held by the Estate of Charles D. Vuono thereby reducing the outstanding capital stock to 400 shares. The corporate minutes of that date, January 21, 1936, read as follows in regard to the retirement: BE IT RESOLVED: that the capital stock of Vuono Construction Company be reduced by retiring four hundred (400) shares held by Mary C. Vuono, as administratrix of the Estate of Charles D. Vuono, deceased, and that the Vuono Construction Company pay to said Administratrix the sum of SIXTY-SIX THOUSAND SIX HUNDRED FORTY-SEVEN and 66/100 ($66,647.66), made up as follows: $36,766.35 in cash, and $29,881.31 by cancelling Charles D. Vuono's debt in that amount, which he owed to the Vuono Construction Company. After the retirement of Charles' stock, 398 shares were owned by Anna and two shares were owned by Joseph. Subsequently Anna transferred small numbers of shares at various times to her family. The outstanding capital stock of the corporation for the years involved was held by the following persons: Shareholder
Relationship
to Anna
1957
1958
1959
Anna
205
205
175
Frederick M. Lione
Son-in-law
1
1
7
Eva V. Lione
Daughter
1
1
7
Frederick Lione and Arthur A. Mitchell,
Trustees for Eva V. Lione
Daughter
96
96
96
Eva V. Lione, Custodian Lois A. Lione
Granddaughter
6
Eva V. Lione, Custodian Lynn A. Lione
Granddaughter
6
Frederick Lione, Jr.
Grandson
6
Frederick Lione and Arthur A. Mitchell, Trustees for Helen V. Mitchell
Daughter
96
96
96
Frederick Lione and Arthur A. Mitchell, Trustees for Helen V. Mitchell
Daughter
1
1
1
Total issued and outstanding
400
400
400
*236 Under the trusts noted in this paragraph, Eva V. Lione and Helen V. Mitchell were the income beneficiaries and remaindermen. It is customary in the area in which the corporation conducts its business that in order for a general contractor to have its bid considered, it must submit a bid bond and qualify for a performance bond equal to the amount of the contract. In order to obtain a bid bond and qualify for a performance bond a rule of thumb adopted by most of the surety industry is that net liquid assets (or working capital) should be at least 10 percent of the work program contemplated expressed in dollars. For example, $100,000 of working capital would qualify for a work program of $1,000,000, including both the unfinished work on hand at the time of the bid and the amount of the bid, provided other related factors such as the contractor's reputation, credit rating, general experience, organizational set-up, and availability of required equipment also were acceptable. Working capital requirements of some surety companies regularly exceed the 10 percent rule of thumb while others may require more or even less on occasion, dependent in large part upon the hazards existing for a specific *237 contract. Performance bonds may be waived by the owner. A prudent contractor, however, will be prepared to provide a bond if required. Performance bonds generally are required on public works contracts. The cost of a performance bond to a general contractor is one percent on the first $100,000 of an accepted bid,.0065 percent per each additional $100,000 up to $2,400,000, and.00525 percent for each additional $100,000. In any case where a performance bond is waived by the owner, the general contractor is able to reduce the cost of his bid and, therefore, the ultimate cost of the contract to the owner. During the years 1957, 1959 and 1959, the corporation was not required by owners to obtain performance bonds and accordingly did not in fact obtain a performance bond for any contracts awarded during those years. In the case of the corporation, the various owners waived the necessity of obtaining performance bonds because of their belief in the corporation's financial structure, quality of work, and credit reputation. The corporation has a history of conservative management. It enjoys a good reputation with its surety company and is on a select list of general contractors maintained *238 by local architects on the basis of integrity, financial ability and general excellence of performance. The corporation's work program in force during each of the years 1957, 1958 and 1959 was as follows: 1957
Work remaining on prior years' contracts over $50,000,
as at 1/1/57:
Stumford
Rehabilitation Center
$ 233,257
Contracts over $50,000 awarded to Vuono-Lione in 1957: Pitney Bowes
$4,058,028
Perkin Elmer
908,530
4,966,558
________ ________ Work program in force in 1957 with respect to contracts over $50,000
5,199,815
Work completed in 1957 on other contracts under $50,000
332,605
________ Total work program in force in 1957
$5,532,420
The Pitney-Bowes contract was the largest contract ever awarded to the corporation. The corporation's first job for over $1,000,000 was obtained in 1945. The work on the Stamford Rehabilitation Center was completed in July 1957. The Perkin Elmer contract was bid on May 8, 1957, and the Pitney-Bowes contract was bid on May 9, 1957. Sometime during 1957, the corporation made a $3,000,000 bid on the Stamford Catholic High School which was not accepted. 1958
Work remaining on prior years' contracts over $50,000, as at 1/1/58:
Pitney-Bowes
$1,773,532
Perkin Elmer
172,337
$1,945,869
________ Contracts over $50,000 awarded to Vuono-Lione in 1958: Pitney-Bowes (add'l)
2,412,640
Perkin Elmer (add'l)
924,110
American Cyanamid
217,304
Home Light Corporation
80,000
3,634,054
________ ________ Work program in force in 1958 with respect to contracts over $50,000
5,579,923
Work completed in 1958 on other contracts under $50,000
671,608
________ Total work program in force in 1958
$6,251,531
*239 The amounts of $802,980.89 and $77,868.90 of the additional Perkin Elmer work, respectively, were bid in September and October 1958. The American Cyanamid job was begun in June 1958 and completed in September 1958. In June and August 1958, respectively, the corporation made bids in the amounts of $92,846 and $1,069,000 which were not accepted. 1959
Work remaining on prior years' contracts over $50,000, as at 1/1/59:
Pitney-Bowes (original)
$ 252,129
Pitney-Bowes (add'l)
2,031,780
Perkin Elmer (add'l)
608,194
$2,892,103
________ Contracts over $50,000 awarded to Vuono-Lione in 1959: Sacred Heart School
68,032
Villa Maria Retreat House
326,430
St. Benedict Social Hall
157,656
St. Clement's Church
391,141
943,259
________ ________ Work program in force in 1959 with respect to contracts over $50,000
3,835,362
Work on other contracts under $50,000 (adjustment)
(10,609)
Total work program in force in 1959
$3,824,753
The original Pitney-Bowes contract was completed in March 1959, and the Perkin Elmer work was completed in April 1959. As of December 31, 1959, $3,240,696.13 of the total work program in force in 1959 was completed. The Villa Maria job was bid in March and in March a bid of $4,470,000 on the Stamford *240 High School was made but not accepted. Had this bid been accepted, the corporation would have been required to provide a performance bond and its surety wrote a bid bond for five percent of the amount of the bid. A total of 12 bids in the aggregate amount of $10,206,030 were bid and not accepted in 1959. Of these bids, one for $916,863 was made in May and two for over $1,000,000 were made in August and September, respectively. A total of $1,490,857 of these bids were made in October and November 1959. Twelve bids in the total amount of $9,177,300 were made and not accepted in the first six months of 1960. One of these bids was for $3,748,000 and two others were for over $1,000,000. The balance sheets of the corporation for the years 1956 through 1959 as shown on its Federal income tax returns were as follows: 11
ASSETS
1956
1957
Cash
$78,779.49
$195,150.43$195,150.43
Notes and accounts receivable
65,194.89
73,448.32
U.S. Government obligations
35,415.00
35,415.00
Other investments: Domestic stocks
$113,929.43
$122,918.06 Mortgages receivable
34,800.00
148,729.43
29,400.00
152,318.06
Fixed depreciable assets: Warehouse
11,220.00
11,220.00 Furniture and fixtures
1,248.49
1,248.49 Tools and equipment
11,299.26
13,380.96 Autos and trucks
13,721.01
15,557.01
37,488.76
41,406.46 Less: Accumulated depreciation
14,383.17
23,105.59
16,350.48
25,055.98
_________ Land
6,450.00
6,450.00
Other assets: Cash surrender value - life insurance
10,402.95
12,637.05 Deposits
200.00
150.00
Reserve for accrued income on
uncompleted contracts due - Net
96,988.64
107,591.59
69,113.76
81,900.81
________ ________ ________ ________ $465,265.99
$569,738.60
LIABILITIES AND CAPITAL
Accrued expenses: Bonuses
$ 6,000.00 Social security taxes
$ 525.02
2,614.42 Federal unemployment taxes
593.07
1,118.14 State unemployment taxes
94.64
1,020.31 State income tax
838.04
3,828.14 Federal income tax
4,496.18
$ 6,546.95
46,877.50
$ 61,458.51
________ _________ Bonds, notes & mortgages payable
20,000.00
10,000.00
Capital stock
10,000.00
10,000.00
Earned surplus
428,719.04
488,280.09
_________ _________ $465,265.99
$569,738.60
*241 ASSETS
1958
1959
Cash
$259,128.36
$200,728.21
Notes and accounts receivable
71,990.61
91,214.39
U. S. Government obligations
35,415.00
35,415.00
Other investments: Domestic stocks
$124,187.60
$131,824.27 Mortgages receivable
19,450.00
143,637.60
15,400.00
147,224.27
_________ _________ Fixed depreciable assets: Warehouse
11,220.00
11,220.00 Furniture and fixtures
2,731.20
2,731.20 Tools and equipment
21,633.03
21,633.03 Autos and trucks
19,309.87
24,462.87
_________ _________ 54,894.10
60,047.10
Less: Accumulated depreciation
14,804.93
40,089.17
22,768.44
37,278.66
Land
6,450.00
6,450.00
Other assets: Cash surrender value - life insurance
15,328.10
18,141.90 Deposits
120.00
100.00 Reserve for accrued income on uncompleted contracts due -- Net
83,151.37
98,599.47
121,699.39
139,941.29
________ ________ _________ _________ $655,310.21
$658,251.82
LIABILITIES AND CAPITAL
Accured expenses: Bounuses
$ 9,000.00
$ 3,500.00 Social security taxes Federal unemployment taxes State unemployment taxes State income tax
5,422.17
3,125.61 Federal income tax
69,427.96
$ 83,850.13
37,403.59
$ 44,029.20
________ _________ Bonds, notes & mortgages
payable Capital stock
10,000.00
10,000.00
Earned surplus
561,460.08
604,222.62
________ _________ $655,310.21
$658,251.82
*242 The fair market value of the domestic stocks owned by the corporation and reflected on its balance sheets for the years 1956 through 1959 was as follows: 1956
1957
1958
1959
Fair market value of stock
$178,650.87
$170,360.35
$238,436.01
$259,653.51
The profit and loss statements of the corporation for the years 1956 through 195 as shown on its Federal income tax returns were as follows: 1956
1957
Gross receipts
$1,108,493.78
$3,586,551.24
Cost of operations: Salaries and wages
$277,332.35
$540,920.10
Sub-contractors
547,593.39
2,204,452.06 Materials
161,041.85
566,410.80 Construction exp. and supplies
46,270.24
68,720.05 General and misc. expenses
5,725.17
7,936.68 Insurance and advertising
16,008.54
1,053,971.54
21,492.44
3,409,932.13
_________ _________ ________ _________ Gross profit
$ 54,522.24
$ 176,619.11
Other income: Dividends
$ 9,263.71
$ 8,534.13 Interest on notes, etc.
2,736.68
3,483.76 Interest on U.S. Government obligations
951.30
625.00 Net capital gains
68.51
13,020.20
365.98
13,008.87
________ ________ _________ _________ Total
$ 67,542.44
$ 189,627.98
Deductions: Compensation of officers
$ 25,700.00
$ 42,700.00 Rent
1,380.00
1,380.00 Interest
712.74
847.33 Taxes
10,614.69
25,433.89 Deductible contributions
1,203.83
5,693.16 Depreciation
5,058.35
5,403.61 Employees' pension plan
$ 44,669.61
$ 81,457.99
Taxable income before special deductions
$ 22,872.83
$108,169.99 Less: Dividend received deduction (85%)
7,874.15
7,254.01
________ ________ Taxable income per return
$ 14,998.68
$ 100,915.98
NOTE: Contributions in excess of limitation
$ 1,800.67
$ (670.66) Federal income tax
4,496.18
46,877.50 Life insurance premiums
1,283.30
2,402.10 Dividends paid
*243 1958
1959
Gross receipts
$3,359,429.01
$3,240,696.13
Cost of operations: Salaries and wages
$520,797.46
$429,011.42
Sub-contractors
2,156,596.11
2,332,745.88 Materials 355,535.24
212,401.90 Construction exp. & supplies
65,122.28
64,788.63 General & misc. expenses
6,824.15
7,091.42 Insurance and advertising
24,652.95
3,129,528.19 23,467.67 3,069,506.92
________ ________ ________ ________ Gross profit
$ 229,900.82
$ 171,189.21
Other income: Dividends
9,033.66
10,066.24 Interest on notes etc.
3,197.79
2,975.41 Interest on U. S. Government obligations
1,076.30
875.00 Net capital gains
157.04
13,464.79
798.77
14,715.42
________ ________ ________ _________ Total
$ 243,365.61
$ 185,904.63
Deductions: Compensation of officers
51,575.00
44,300.00 Rent
1,380.00
1,380.00 Interest
35.33 Taxes
24,020.26
23,541.38 Deductible contributions
7,992.23
7,963.51 Depreciation
6,510.60
7,963.51 Employees' pension plan
91,513.22
94,426.67
________ ________ ________ ________ Taxable income before special deductions
$151,852.39
$ 91,477.96 Less: Dividend received deduction (85%)
7,678.61
8,556.30
________ ________ Taxable income per return
$144,173.78
$ 82,921.66
NOTE: Contributions in excess of of limitation
$ (698.31)
$ 1,787.03 Federal income tax
69,427.96
37,403.59 Life insurance premiums
1,942.75
1,524.80 Dividends paid
8,000.00
8,000.00
*244 The corporation's total sales, net operating income and investment income for the years 1944 through 1963 and the working capital and earned surplus on December 31 of those years as shown on its books and records were as follows: Before Tax
On December 31
Net
Operating
Investment
Working
Earned
Year
Sales
Income
Income
Capital
Surplus
1944
$ 166,929
$ 5,398
$ 1,624
$150,649
$153,005
1945
200,336
11,317
1,249
168,846
162,252
1946
676,176
25,896
1,505
177,328
182,456
1947
516,283
28,444
1,647
187,402
203,907
1948
1,742,668
129,087
3,388
264,442
285,427
1949
969,650
117,484
5,070
335,605
362,337
1950
1,280,780
50,427
8,627
379,097
400,810
1951
1,139,834
19,472
10,218
415,343
420,918
1952
1,443,894
26,373
9,852
417,716
445,483
1953
1,757,668
11,061
12,256
433,164
462,376
1954
1,276,232
(10,293)
11,476
371,355
403,195 *
1955
1,225,450
1,357
12,576
380,775
413,426
1956
1,108,493
9,853
13,020
398,561
428,719
1957
3,586,551
95,161
13,009
453,987
488,280
1958
3,359,429
138,388
13,465
509,473
561,460
1959
3,240,696
76,763
14,715
552,252
604,223
1960
2,524,000
125,755
15,093
601,088
658,363
1961
2,789,679
74,153
18,419
644,029
704,298
1962
3,221,129
24,566
21,846
650,868
711,620
1963
3,216,700
(285,613)
16,940
380,651
446,493
The working capital *245 of the corporation computed by substituting the fair market value of the domestic stocks for their value appearing on the corporation's balance sheets was as follows on December 31 of the following years: 1956
1957
1958
1959
$463,282
$501,429
$623,721
$680,081
The corporation's ratio of current assets to current liabilities in 1957, 1958 and 1959 was 7.5 to 1, 7.3 to 1 and 14 to 1, respectively. Computed with the fair market value of domestic stocks, this ratio in these years was 8.2 to 1, 8.6 to 1 and 16.9 to 1. As a general rule, the contract price of a construction job is paid to the general contractor on a monthly basis with an amount equal to 10 percent of the contract price being withheld by the owner until the completion of the job. The final 10 percent is usually due 30 days after completion and final payment may be made from 30 to 90 days after completion. Final payment on the Pitney-Bowes contract was made one day after completion. Many general contractors withhold 10 percent of the subcontract price from their subcontractors until completion of the entire job. The corporate petitioner generally pays its subcontractors the full subcontract price upon completion of the subcontracted *246 portion of the job. Many general contractors borrow to meet current expenses. The corporate petitioner borrowed no money during the years in issue after January 1957, and during 1957 and 1958 paid all its notes payable in the total amount of $55,000. In November 1958 the corporation requested and received a $200,000 advance on the 10 percent of contract price withheld until completion from Pitney-Bowes, Inc., because it needed cash to meet current expenses. The month-end cash balances shown on the corporation's checkbook for the years in issue were as follows: Month
1957
1958
1959
January
$ 4,397.84
$ 57,683.20
$129,434.75
February
992.43
17,030.96
309,719.03
March
21,537.05
29,925.09
218,100.86
April
39,107.95
51,099.07
(126,290.13)
May
713.25
47,011.36
(96,849.84)
June
38,824.90
36,591.85
55,613.48
July
51,848.18
44,419.77
21,400.18
August
35,408.41
4,553.64
(2,689.73)
September
43,515.67
54,921.41
(22,303.09)
October
36,081.43
(27,317.12)
23,967.03
November
17,897.08
100,232.72
55,814.31
December
129,887.96
191,852.55
134,330.00 The overdrafts for October 1958, April 1959, May 1959, August 1959, and September 1959 do not represent actual overdrafts on the corporation's bank account. The overdrafts resulted from writing out checks *247 and deducting them from the checkbook balance. However, these checks were not mailed until a receipt and deposit of cash were made by the corporation to cover the checks. The balances do not include funds in savings accounts. The corporation maintained the following savings accounts on January 1, 1949: First Stamford National Bank and
Trust
$ 2,603.81
South Norwalk Savings
5,000.00
Springdale Bank and Trust Co.
5,075.28
West Side Bank, Bridgeport, Connec-
ticut
5,000.00
Stamford Federal Savings and Loan
Association
5,157.81
Stamford Trust Co.
6,224.44
Stamford Savings Bank
13,482.53
Citizens Savings Bank
6,687.59
Fidelity Title and Trust Co.
6,086.80
Greenwich Trust Co.
3,627.49
Total
$58,945.75 From January 1, 1949, to December 31, 1963, there were no deposits or withdrawals in the above savings accounts, except for the account at the West Side Bank, Bridgeport, Connecticut, which was closed on July 19, 1955, and the account at the First Stamford National Bank & Trust which was closed on October 5, 1959. The balances do not include interest credited to the accounts. Certain of these savings accounts were used to secure bank loans obtained by the corporation in 1956 and January 1957. Prior to 1958, the corporation *248 paid no dividends. In April 1956, a dividend of $2,000 was declared and subsequently cancelled. On October 28, 1958, the corporation declared and paid a dividend of $8,000. Respondent's investigation of the corporation began on November 13, 1959. On December 11, 1959, the corporation declared and paid a dividend of $8,000 and on February 15, 1960, a dividend of $16,000 was declared and paid on February 25, 1960. The dividend paid in 1960 qualifies for Federal income tax purposes as a dividend paid in 1959. The corporation paid additional dividends of $8,000 in 1960 and dividends of $8,000 in 1961 and $24,000 in 1962. The corporation's books and records reflect the following balances in the accounts of Anna and Frederick as of December 31 for the years indicated: Year
Anna Vuono
Frederick Lione
1948
$ 9,421
1949
5,566
1950
(749)
$ 1,420
1951
695
1,774
1952
(184)
2,505
1953
(472)
2,305
1954
1,206
11,329
1955
5,149
12,010
1956
6,460
41,332
1957
20,875
35,170
1958
21,247
26,441
1959
36,030
28,204
1960
33,162
11,352
1961
29,662
9,300
1962
21,262
3,520
1963
21,262
3,970 The following withdrawals and (credits) were made to Anna's account on the books and records of the corporation during the years 1957, 1958 and 1959: Date
Explanation
1957
1958
1959
Balance as of 1/1
$ 6,460.46
$20,875.56
$21,247.59
Mar. 7
New York Life
183.50
Apr. 8
Federal taxes
1,343.73
Apr. 17
New York Life
183.50
May 8
Check
3,000.00
June 18
Check
15,400.00
July 8
City taxes
831.60
July 9
City taxes
844.80
July 10
Collector of Taxes
941.60
July 15
Check
39,674.48
Oct. 7
F. M. Lione, Jr.
(24,398.08)
Oct. 8
F. Lione, Jr.
1,565.00
Dec. 26
Internal Revenue
3,000.00
Dec. 31
Bonuses
(5,000.00)
(5,000.00)
(3,000.00)
The *249 withdrawals by Anna from the corporation of $15,400 on June 18, 1957, $39,674.48 on July 15, 1959, and $1,565 on October 8, 1959, were loaned by her to her grandson, Frederick Lione, Jr., who applied the funds toward the purchase of a new residence. The credit to Anna's account with the corporation on October 7, 1959, of $24,398.08 represented the proceeds received by Frederick, Jr., upon the sale of the residence purchased by him in 1957 which he turned over to Anna. On January 9, 1957, and January 7, 1959, Anna executed demand notes in favor of the corporation in the amounts of $20,000 and $18,000, respectively. Anna paid no interest to nor was charged any interest by the corporation during the years in issue. She provided no collateral securing the amounts of her withdrawals. Frederick's account on the corporation's books was charged with the following withdrawals and (credits) during 1957, 1958 and 1959: Date
Explanation
1957
1958
1959
Balance as of 1/1
$41,332.48
$35,170.81
$26,441.07
Feb. 5
Check
1,200.00
Mar. 11
Mutual Life
32.76
11
Northeastern Mutual
20.48
27
Internal Revenue
3,027.43
Apr. 8
Federal taxes
2,404.16
12
Coll. of Int. Rev.
261.50
15
Frederick Lione, Jr.
5,000.00
22
R. D. Andrea
1,055.50
June 12
Mutual Trust Life
291.80
17
City taxes
366.69
July 9
City of Stamford
367.80
10
Collector of taxes
505.64
Oct. 21
R. D. Andrea
738.50
Nov. 3
Equitable Life
498.30
8
Equitable Life
498.31
8
Northwestern Mutual
864.59
10
Equitable Life
498.30
Dec. 3
155 shares Conde Nast
1,240.00
20
Internal Revenue
3,000.00
31
Bonuses
(10,000.00)
(15,000.00)
(10,000.00)
*250 Frederick paid no interest to nor was charged any interest by the corporation during the years in issue. He executed no demand notes in favor of the corporation and put up no collateral securing his withdrawals. Salaries and bonuses paid to Anna and Frederick for the years 1944 through 1963 were as follows: Anna Vuono
Frederick Lione
Salary
Bonus
Salary
Bonus
1944
$3,900
0
$ 3,900
$ 663
1945
3,900
0
3,900
695
1946
3,900
0
3,900
695
1947
3,900
$3,000
6,500
4,364
1948
3,900
5,000
6,500
10,000
1949
5,200
5,000
10,400
10,000
1950
5,200
5,000
10,400
10,000
1951
5,200
1,000
10,400
3,000
1952
5,200
2,000
10,400
5,000
1953
5,200
2,000
10,400
5,000
1954
5,200
0
10,400
0
1955
5,200
0
10,400
0
1956
5,200
0
10,400
0
1957
5,200
5,000
10,400
10,000
1958
5,200
5,000
11,500
15,000
1959
5,200
3,000
13,000
10,000
1960
5,200
0
17,600
10,000
1961
5,200
0
18,700
0
1962
5,200
0
9,800
10,000
1963
5,200
0
9,500
10,000
In the years 1957, 1958, and 1959, Frederick's highest reported income tax brackets were 30 percent, 43 percent, and 43 percent, respectively, and Anna's highest reported income tax brackets for those years were 38 percent, 43 percent, and 34 percent, respectively. Respondent's notice of deficiency was mailed on March 27, 1962. Prior to his notice of deficiency respondent notified the corporation *251 that he intended to impose the accumulated earnings tax under section 531 of the Internal Revenue Code of 1954. The corporation filed a timely statement pursuant to section 534(c) of the 1954 Code. The grounds relied upon by the corporation in this statement to establish that its earnings and profits had not been permitted to accumulate beyond the reasonable needs of its business were as follows: I. The earnings and profits of taxpayer were necessary to provide for the bona fide expansion of its business; II. The retention of earnings and profits was required in order to provide necessary working capital for taxpayer's business; and III. The retention of earnings and profits was required as a safeguard against the risks and hazards of the construction business. The statement set forth facts sufficient to show the basis of the grounds relied upon. The earnings and profits of the corporation were not permitted to accumulate beyond the reasonable needs of its business during the taxable years involved. The corporate petitioner was not availed of during the taxable years for the purpose of avoiding the income tax in respect of its shareholders by permitting earnings and profits to accumulate *252 instead of being divided or distributed. The amount of net withdrawals credited to Anna's account during each of the taxable years involved represented loans and did not constitute dividend income. Opinion Respondent determined that petitioner Vuono-Lione, Inc., is liable for the accumulated earnings tax imposed by sections 531 and 532 of the Internal Revenue Code of 1954[1] for each of the taxable years 1957, 1958 and 1959 because it was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Section 531 imposes a tax upon the accumulated taxable income of a corporation described in section 532 as being availed of for the purpose of avoiding the income tax with respect to shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. [2] Section 533 [3] *254 provides that the fact that earnings and profits are accumulated beyond the reasonable needs of the business establishes the prohibited purpose unless the corporation *253 proves otherwise by the preponderance of the evidence. The reasonable needs of the business include reasonably anticipated needs. Section 537. Section 534 [4] *255 provides a method whereby the corporation may shift to respondent the burden of proof as to whether earnings were accumulated beyond the reasonable needs of the business. If after notification of respondent's intention to impose the accumulated earnings tax the corporation submits a statement of the grounds it relies upon to establish that its earnings and profits were not accumulated beyond its reasonable needs, together with facts sufficient to show the basis thereof, the burden of proof as to these grounds shifts to respondent. After notification of respondent's intention to impose the section 531 tax, the corporation submitted a statement pursuant to section 534 setting forth the grounds it relied upon to establish that its earnings and profits were not accumulated beyond its reasonable needs, together with facts intended to show the basis of the grounds alleged. The corporation contends *256 that its statement was sufficient to shift the burden of proof to respondent with respect to the grounds contained therein. Respondent maintains that the facts contained in the statement were not sufficient to show the basis of the grounds alleged and that the third ground relied upon is legally insufficient to establish that earnings have not been accumulated beyond the reasonable needs of the business. We think the statement submitted by the corporation is sufficient to shift the burden of proof to respondent, at least as to the first two grounds alleged. These allegations state grounds which, if true, would support a finding that the accumulation of earnings was for the corporation's reasonable business needs. See Income Tax Regs., section 1.537-2(b)(1) and (4). The facts presented to show the basis of these grounds are material and definite and substantially support the grounds alleged. The corporation is required in the section 534 statement only to present facts sufficient "to show the basis" of the grounds it relies upon, not to establish its case. We need not, however, rely upon the fact that the respondent has the burden of proof upon the question of reasonable needs since *257 in our opinion the evidence presented establishes that retention of petitioner's earnings in each of the years in issue was reasonably necessary to provide the working capital required for its business. The second ground relied upon by the corporation in its section 534 statement is that the retention of earnings was required in order to provide necessary working capital for its business. The corporation's earned surplus on December 31, 1956, 1957, 1958 and 1959 was $428,719, $488,280, $561,460, and $604,223, respectively. Its working capital on each of these dates as shown on its books and records was $398,561, $453,987, $509,473, and $552,252, respectively. Computed by valuing the domestic stock at fair market value rather than at cost, as it appears on its balance sheets, its working capital on these dates, respectively, was $463,282, $501,429, $623,721, and $680,081. Respondent contends that the corporation's working capital on December 31, 1956, was sufficient to provide for its reasonable business needs, including future anticipated needs. The evidence establishes that in the area in which the corporation conducts its business it is customary for a contractor to be required to *258 provide a performance bond in order to obtain a job. In order to qualify for a performance bond, a rule of thumb adopted by most of the surety industry is that a contractor's working capital must be at least 10 percent of the contemplated work program. Some sureties require working capital equal to a larger percentage of the work program contemplated. The corporation's total work program in force in 1957 was $5,532,420. Part of this amount represents $233,257 work remaining from 1956 on the Stamford Rehabilitation Center which was completed in July. Part represents $332,605 of work completed on contracts for under $50,000 about which there is no evidence as to bid or completion dates. The remainder of the work program in force in 1957 consists of the Perkin Elmer contract for $908,530 bid on May 8, 1957, and the Pitney-Bowes contract for $4,058,028 bid on May 9, 1957. In order to qualify for performance bonds on these jobs under the standard 10 percent rule of thumb, the corporation needed working capital in the amounts of $90,853 and $405,803 on May 8 and 9, respectively, or a total of $496,656, plus 10 percent of the work remaining on the Stamford Rehabilitation Center and 10 percent *259 of any work then in progress on contracts under $50,000. Its working capital on December 31, 1956, in the amount of $463,282 was insufficient to meet this working capital requirement and its working capital of $501,429 on December 31, 1957, was not unreasonably in excess of this requirement. There is no evidence of what the working capital of the corporation was on May 8, 1957. However, since operating expenses in the construction industry are necessarily greatest during peak activity in the good weather months of the spring, summer and fall, it is reasonable to assume that working capital available during these months was less than in December. The corporation's balance of cash at the end of May 1957 was only $713.23, the lowest month-end balance of the year. Since the corporation needed the amount of working capital shown on December 31, 1957, during 1957, and since in light of its history of growth it could reasonably be expected to need working capital in that amount in 1958, its accumulation of earnings in 1957 was necessary to provide needed working capital for its business. The accumulation therefore was not in excess of the reasonable needs of its business. In 1958 the corporation's *260 total work program in force was $6,251,531. The corporation's working capital of $501,429 on December 31, 1957, was substantially below the requirement for the total work program in 1958. Of the total work program in force in 1958, $1,945,869 represents work on contracts over $50,000 remaining from 1957, $3,634,054 represents contracts for over $50,000 awarded during the year, and $671,608 represents work completed on contracts for under $50,000. There is little evidence of when bids were made in 1958, the work program in force on the bid dates, or the amount of working capital available on any bid date. What evidence is available indicates one contract for $802,980.89 was bid in September, one for $77,868.90 in October, and one for $217,304 was begun in June and completed in September. Also in June and August bids in the amount of $92,846 and $1,069,000, respectively, were made by not accepted. In October 1958, the corporation's month-end cash balance was a deficit of $27,317.12 and in November the corporation requested and received a $200,000 advance on the 10 percent withholding on contract price from Pitney-Bowes, Inc. On the evidence presented the corporation's working capital *261 in the amount of $623,721 on December 31, 1958, was not in excess of its reasonable needs in 1958. In 1959, the corporation clearly required working capital in excess of the $623,721 available on December 31, 1958. In March 1959 a bid in the amount of $326,430 was accepted and a bid in the amount of $4,470,000 was made and not accepted. Had the latter bid been accepted, the corporation would have been required to obtain a performance bond. Thus, the corporation required working capital to meet bonding requirements in March in the amount of $479,643 plus 10 percent of the amount of work remaining on prior years' contracts. On January 1, 1959, the corporation had work remaining on prior years' contracts in the amount of $2,892,103. The work remaining on the original Pitney-Bowes contract in the amount of $252,129 was completed in March and the work remaining on the additional Perkin Elmer job in the amount of $608,194 was completed in April, leaving $1,931,780 of the work remaining from the prior years uncompleted. Therefore, the corporation's working capital requirements in March 1957 were $479,643 plus approximately $193,178, or approximately $672,821. Only $943,259 worth of new contracts *262 for over $50,000 was awarded the corporation in 1959 so that its total work program in force for the year, $3,824,753, was less than that of the prior two years. However, the corporation made total bids of $10,206,030 which were not accepted in 1959. Its month-end cash balance showed deposits of $126,290.13, $96,849.84, $2,689.73 and $22,303.09 in April, May, August, and September, respectively. On the evidence presented, working capital of the corporation on December 31, 1959, in the amount of $680,081 was not unreasonably in excess of the amount needed in 1959 or anticipated in 1960 to be needed to meet the requirements for performance bonds. Therefore, as in 1957 and 1958, the retention of earnings was necessary in order to provide needed working capital and was not beyond the reasonable needs of the business. The fact that the corporation was not required to provide a performance bond on any of its jobs is immaterial since it had to be prepared to provide a bond if required. Moreover, it was not required to provide performance bonds largely because of its financial structure, including its working capital and its credit reputation. Even if the amount of working capital in each *263 of the years involved was in excess of the amount required to qualify for performance bonds on bids made during such year, it does not appear that the accumulation of earnings necessarily was unreasonable. The corporation had a history of conservative management and steady growth. In 1957 it received the largest award in its corporate existence, the $4,058,028 Pitney-Bowes contract. Its sales increased from $1,108,493 in 1956 to $3,586,551 in 1957. It had substantial net operating income in 1957 for the first time since suffering an operating loss of $10,293 in 1954. It is not our place to substitute our judgment for that of the corporation's management to require the corporation immediately to distribute the fruits of its gain. James M. Pierce Corporation, 38 T.C. 643, reversed on another issue 326 F. 2d 67 (C.A. 8); Breitfeller Sales, Inc., 28 T.C. 1164. It should be allowed to decide whether to continue to expand its operations. Respondent contends that the facts that the corporation made loans to its stockholders, invested a large part of its retained earnings in domestic stocks, and had a ratio of current assets to current liabilities of 8.2 to 1, 8.6 to 1 and 16.9 to 1 in *264 1957, 1958 and 1959, respectively, indicate that the retention of earnings in these years was not for the reasonable needs of the business. We recognize that each of these facts require careful consideration. Income Tax Regs., sec. 1.537-2(c); Kerr-Cochran, Inc., 253 F. 2d 121 (C.A. 8), affirming 30 T.C. 69; American Metal Products Corporation, 34 T.C. 89, affd. 287 F. 2d 860 (C.A. 8). We do not agree, however that considering all the facts and circumstances of the present case, such facts require a holding that retention of earnings in each of the taxable years involved was not for the reasonable needs of the business. The corporation's working capital requirements were not limited to needs for operating capital, but included also the need for capital to meet the standards for bondability required by sureties. The withdrawals made by or on behalf of Anna and Frederick appear on the corporation's balance sheets as notes and accounts receivable and constitute part of its working capital available to meet the requirements for bid and performance bonds. Both Anna and Frederick made substantial repayments of these withdrawals in the years in issue. The amount of Frederick's repayments *265 in these years exceeded his withdrawals. In addition to substantial credits to Anna's account in each of the taxable years, Anna executed demand notes to the corporation in the amounts of $20,000 in January 1957 and $18,000 in January 1959. The corporation's accountant testified both notes were given in anticipation of withdrawals which Anna expected to make in order to assist her grandson to purchase a residence. The $20,000 note was sufficient to cover all but $875.56 of the indebtedness shown on Anna's drawing account for 1957, and all but $1,247.59 of the indebtedness for 1958. In 1959 the $20,000 note and the additional $18,000 note given in that year exceeded the total indebtedness shown on the drawing account by $1,969.41. Thus, it appears that in the three years involved, Anna's indebtedness was substantially or (in the case of 1959) entirely covered by demand notes, which the evidence indicates could, if necessary, have been discounted at the bank. The nature and extent of the loans to the corporation's stockholders were not such as to render the retention of the earnings in the years involved as unreasonable. Also, since not all of the corporation's working capital requirements *266 were needed for operating capital, the fact that it invested part of its earnings in domestic stocks does not establish that it did not need the amount of its working capital in the years in issue. The corporation's ratio of current assets to current liabilities of 7.5 to 1, 7.3 to 1 and 14 to 1, respectively (or 8.2 to 1, 8.6 to 1, and 16.9 to 1, respectively, if the current market values of the securities are considered), in the taxable years in issue was not so high that, in light of the other evidence in the case, it indicates an accumulation of earnings beyond the corporation's reasonable business needs. Since, in order to qualify for performance bonds, the corporation was required to have working capital on its books of 10 percent of the work program contemplated regardless of its need for operating capital, this case is distinguishable from cases such as Wellman Operating Corporation, 33 T.C. 162, and American Metal Products Corporation, supra, where current ratios of 11 to 1 and 20 to 1, respectively, were held indicative of an unreasonable accumulation. The evidence which establishes that the retention of the corporation's earnings was required to provide necessary working *267 capital also establishes that the earnings were necessary to provide for the bona fide expansion of the corporation's business, the first ground alleged by the corporation in its section 534 statement. The corporation had a history of steady growth from its incorporation. Its total work program in force increased in 1957 and 1958, and although its total work program decreased in 1959, the amount of new work bid in 1959 increased substantially over prior years. Since the corporation needed the amount of its working capital to qualify for performance bonds on the amount of work bid in the years in issue, and since the corporation's work program and work bid did in fact increase during the years in issue, it needed its working capital in each of the years in issue for the bona fide expansion of its business. Notwithstanding our finding that the earnings and profits of the corporation were not accumulated beyond the reasonable needs of its business, the burden still remains upon the corporate petitioner to establish in fact that the earnings and profits were not permitted to accumulate for the purpose of avoiding the income tax with respect to its shareholders. Sandy Estate Co., 43 T.C. 361, *268 and cases cited therein. We think the petitioner has carried its burden on this issue. The fact that the accumulation of earnings is not unreasonable in light of the corporation's business needs is repugnant to the existence of a purpose to avoid tax and, although not conclusive, is substantial evidence that such a purpose did not exist. United States v. R. C. Tway Coal Sales Co., 75 F. 2d 336 (C.A. 6); Jones v. KOMA, 218 F. 2d 530 (C.A. 10). Cf. Electric Regulator Corporation v. Commissioner, 336 F. 2d 339 (C.A. 2, 1964), reversing, 40 T.C. 757 for other reasons. We are satisfied from our examination of all the facts that the earnings were not retained for any purpose other than to meet the reasonable business needs of the corporation and that tax avoidance was not a consideration for such retention. Accordingly, we hold that the corporation was not formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings to accumulate instead of being divided or distributed. Another reason for holding that the corporation is not liable for the accumulated earnings tax is to be found in section 535 (a) and (c)(1). [5] *270 Section 535(c)(1) *269 provides for a credit against the accumulated taxable income on which the section 531 tax is imposed. Since we have found that all of the earnings were retained for the reasonable needs of the business, the section 535(c)(1) credit would be the total taxable income for each of the years involved and, accordingly, the accumulated taxable income on which the section 531 tax is imposed would be zero. The second issue is whether Anna realized dividend income to the extent of net withdrawals from the corporation in the taxable years involved. As we have previously pointed out in connection with the first issue, the withdrawals made by Anna and Frederick were carried on the corporation's balance sheets as notes and accounts receivable and constituted part of the working capital available to meet the sureties' requirements for bid and performance bonds. Anna not only made substantial repayments of the amounts withdrawn by her during the taxable years, but she executed demand notes sufficient to cover substantially all of the indebtedness shown on her drawing account for the years 1957 and 1958 and in excess of her withdrawals as of the end of 1959. We considered her net withdrawals as loans and a part of the working capital of the corporation for the purposes of the first issue. We reach the same conclusion for the purposes of the second issue. Accordingly, we hold that Anna did not realize *271 dividend income by reason of her net withdrawals from the corporation during the taxable years. Decisions will be entered under Rule 50. Footnotes
*. Includes a reduction of $55,536.18 representing cancellation of Joseph's loan.↩
1. Except as otherwise indicated, all section references hereinafter will refer to the Internal Revenue Code of 1954.↩
2. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27 1/2 percent of the accumulated taxable income not in excess of $100,000, plus (2) 38 1/2 percent of the accumulated taxable income in excess of $100,000. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531↩ shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. 3. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.
4. SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. * * *
(c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.↩
5. SEC. 535. ACCUMULATED TAXABLE INCOME. (a) Definition. - For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus the sum of the dividends paid deduction (as defined in section 561) and the accumulated earnings credit (as defined in subsection (c)). * * *
(c) Accumulated Earnings Credit. - (1) General Rule. - For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, minus (B) the deduction allowed by subsection (b)(6). For purposes of this paragraph, the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction (as defined in section 561) for such year.